## DEPARTMENT OF REVENUE OF WASHINGTON *v.* ASSOCIATION OF WASHINGTON STEVEDORING COMPANIES ET AL.

No. 76–1706.  Argued January 16–17, 1978—Decided April 26, 1978

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, MARSHALL, REHNQUIST, and STEVENS, JJ., joined, and in all but Part III–B of which POWELL, J., joined. POWELL, J., filed an opinion concurring in part and concurring in the result, *post*, p. 761. BRENNAN, J., took no part in the consideration or decision of the case.

*Slade Gorton,* Attorney General of Washington, argued the cause for petitioner. With him on the briefs were *Richard H. Holmquist,* Senior Assistant Attorney General, and *Matthew J. Coyle,* Assistant Attorney General.

*John T. Piper* argued the cause for respondents. With him on the brief was *D. Michael Young.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

For the second time in this century, the State of Washington would apply its business and occupation tax to stevedoring. The State's first application of the tax to stevedoring was unsuccessful, for it was held to be unconstitutional as violative of the Commerce Clause [1] of the United States Constitution. *Puget Sound Stevedoring Co.* v. *State Tax Comm'n,* 302 U. S. 90 (1937). The Court now faces the question whether Washington's second attempt violates either the Commerce Clause or the Import-Export Clause.[2]

---

[1] "The Congress shall have Power . . .

.            .            .            .            .

"To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes . . . ." U. S. Const., Art. I, § 8, cl. 3.

[2] "No State shall, without the Consent of the Congress, lay any Imposts

## I

Stevedoring is the business of loading and unloading cargo from ships.[3]  Private stevedoring companies constitute respondent Association of Washington Stevedoring Companies; respondent Washington Public Ports Association is a nonprofit corporation consisting of port authorities that engage in stevedoring activities.  App. 3.  In 1974 petitioner Department of Revenue of the State of Washington adopted Revised Rule 193, pt. D, Wash. Admin. Code 458–20–193–D, to implement the State's 1% business and occupation tax on

or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws: and the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States; and all such Laws shall be subject to the Revision and Controul of the Congress." U. S. Const., Art. I, § 10, cl. 2.

[3] The record does not contain a precise definition or description of the business of stevedoring or of the activities of respondents and their respective members.  By admitting the factual allegations in the respondents' Petition for Declaratory Judgment on Validity of Rule, App. 3–7, petitioner Department of Revenue accepted paragraph VI of that petition. That paragraph alleged that the private companies that constitute respondent Association of Washington Stevedoring Companies "are engaged in the same stevedoring activities that were held not taxable in *Puget Sound Stevedoring Co.*"  This Court explained the activities of the appellant stevedoring company in *Puget Sound* as follows:

"What was done by this appellant in the business of loading and unloading was not prolonged beyond the stage of transportation and its reasonable incidents. . . .  True, the service did not begin or end at the ship's side, where the cargo is placed upon a sling attached to the ship's tackle.  It took in the work of carriage to and from the 'first place of rest,' which means that it covered the space between the hold of the vessel and a convenient point of discharge upon the dock. . . .  The fact is stipulated, however, that no matter by whom the work is done or paid for, 'stevedoring services are essential to waterborne commerce and always commence in the hold of the vessel and end at the "first place of rest," and vice versa.' " 302 U. S., at 93.

services, set forth in Wash. Rev. Code §§ 82.04.220 and 82.04.290 (1976).[4] The Rule applies the tax to stevedoring and reads in pertinent part as set forth in the margin.[5]

Revised Rule 193D restores the original scope of the Washington business and occupation tax. After initial imposition

---

[4] Section 82.04.220 reads:

"There is levied and shall be collected from every person a tax for the act or privilege of engaging in business activities. Such tax shall be measured by the application of rates against value of products, gross proceeds of sales, or gross income of the business, as the case may be."

Section 82.04.290 reads in pertinent part:

"Upon every person engaging within this state in any business activity other than or in addition to those enumerated in . . . ; as to such persons the amount of tax on account of such activities shall be equal to the gross income of the business multiplied by the rate of one percent. This section includes, among others, and without limiting the scope hereof . . . , persons engaged in the business of rendering any type of service which does not constitute a 'sale at retail' or a 'sale at wholesale.' "

We note, also, that § 82.04.460 reads in part:

"Any person rendering services taxable under RCW 82.04.290 and maintaining places of business both within and without this state which contribute to the rendition of such services shall, for the purpose of computing tax liability under RCW 82.04.290, apportion to this state that portion of his gross income which is derived from services rendered within this state."

A temporary additional tax of 6% of the base tax is now imposed for the period from June 1, 1976, through June 30, 1979. 1977 Wash. Laws, 1st Ex. Sess., ch. 324, § 1, and 1975–1976 Wash. Laws, 2d Ex. Sess., ch. 130, § 3, codified as Wash. Rev. Code § 82.04.2901 (Supp. 1977).

[5] "In computing tax there may be deducted from gross income the amount thereof derived as compensation for performance of services which in themselves constitute interstate or foreign commerce to the extent that a tax measured thereby constitutes an impermissible burden upon such commerce. A tax does not constitute an impermissible burden upon interstate or foreign commerce unless the tax discriminates against that commerce by placing a burden thereon that is not borne by intrastate commerce, or unless the tax subjects the activity to the risk of repeated exactions of the same nature from other states. Transporting across the state's boundaries is exempt, whereas supplying such transporters with

of the tax in 1935,[6] the then State Tax Commission [7] adopted Rule 198 of the Rules and Regulations Relating to the Revenue Act of 1935.[8] That Rule permitted taxpayers to deduct certain income received from interstate and foreign commerce. Income from stevedoring, however, was not described as deductible. When, in 1937, this Court in *Puget Sound* invalidated the application of the tax to stevedoring, the Commission complied by adding stevedoring income to the list of

---

facilities, arranging accommodations, providing funds and the like, by which they engage in such commerce is taxable.

"EXAMPLES OF EXEMPT INCOME:

"1. Income from those activities which consist of the actual transportation of persons or property across the state's boundaries is exempt.

.        .        .        .

"EXAMPLES OF TAXABLE INCOME:

.        .        .        .        .

"3. Compensation received by contracting, stevedoring or loading companies for services performed within this state is taxable."

[6] 1935 Wash. Laws, ch. 180.

[7] The Tax Commission was abolished in 1967, and, with specified exceptions, its powers, duties, and functions were transferred to the Director of the Department of Revenue. 1967 Wash. Laws, Ex. Sess., ch. 26, § 7.

[8] Rule 198, as it was in effect in 1936 and 1937, that is, prior to the decision in *Puget Sound,* read in part:

"In computing the tax under the classification of 'Service and Other Business Activities' there may be deducted from gross income of the business the amount thereof derived as compensation for the performance of services which in themselves constitute foreign or interstate commerce to an extent that a tax measured by the compensation received therefrom constitutes a direct burden upon such commerce. Included in the above are those activities which involve the actual transportation of goods or commodities in foreign commerce or commerce between the states; the transmission of communications from a point within the state to a point outside the state and vice versa; the solicitation of freight for foreign or interstate shipment; and the selling of tickets for foreign and interstate passage accommodations." Rules and Regulations Relating to the Revenue Act of 1935, Rule 198, p. 122 (1936); *id.,* at 133 (1937).

deductions.[9] The deduction for stevedoring remained in effect until the revision of Rule 193 in 1974.[10]

Seeking to retain their theretofore-enjoyed exemption from the tax, respondents in January 1975 sought from the Superior Court of Thurston County, Wash., a declaratory judgment to the effect that Revised Rule 193D violated both the Commerce Clause and the Import-Export Clause. They urged that the case was controlled by *Puget Sound,* which this Court had reaffirmed in *Joseph* v. *Carter & Weekes Stevedoring Co.,* 330 U. S. 422, 433 (1947) (together, the *Stevedoring Cases*). Absent a clear invitation from this Court, respondents submitted that the Superior Court could not avoid the force of the *Stevedoring Cases,* which had never been overruled. Record 9.[11] Petitioner replied that this Court had invited rejection

---

[9] Effective May 1, 1939, Rule 198 read in part:

"In computing the tax under the classification of 'Service and Other Business Activities' there may be deducted from gross income of the business the amount thereof derived as compensation for the performance of services which in themselves constitute foreign or interstate commerce to an extent that a tax measured by the compensation received therefrom constitutes a direct burden upon such commerce. Included in the above [is] . . . the compensation received by a contracting stevedoring company for loading and unloading cargo from vessels where such cargo is moving in interstate or foreign commerce and where the work is actually directed and controlled by the stevedoring company . . . ." *Id.,* at 137 (1939).

[10] Rules and Regulations Relating to the Revenue Act of 1935, Rule 193, p. 94 (1943), and *id.,* Rule 193, p. 123 (1970).

[11] In a reply brief, respondents supported the continuing validity of the *Stevedoring Cases.* In particular, they argued:

"Final, and we think conclusive, proof of the continued vitality of the stevedoring cases lies in the language of *Spector Motor Service, Inc.* v. *O'Connor,* 340 U. S. 602 . . . (1951), decided *after* all four of the 'major' cases relied on by the State. We have previously noted that *Spector* struck down a tax on the activity of moving goods in interstate commerce." Record 69 (emphasis in original).

*Spector* was overruled last Term in *Complete Auto Transit, Inc.* v. *Brady,* 430 U. S. 274, 288–289 (1977), decided after respondents advanced the above argument.

of those cases by casting doubt on the Commerce Clause analysis that distinguished between direct and indirect taxation of interstate commerce. *Id.*, at 25–37, citing, *e. g.*, *Interstate Pipe Line Co.* v. *Stone*, 337 U. S. 662 (1949); *Western Live Stock* v. *Bureau of Revenue*, 303 U. S. 250 (1938). Petitioner also argued that the Rule did not violate the Commerce Clause because it taxed only intrastate activity, namely, the loading and unloading of ships, Record 17–20, and because it levied only a nondiscriminatory tax apportioned to the activity within the State. *Id.*, at 20–22. The Rule did not impose any "Imposts or Duties on Imports or Exports" because it taxed merely the stevedoring services and not the goods themselves, *id.*, at 22–25, citing *Canton R. Co.* v. *Rogan*, 340 U. S. 511 (1951). The Superior Court, however, not surprisingly, considered itself bound by the *Stevedoring Cases*. It therefore issued a declaratory judgment that Rule 193D was invalid to the extent it related to stevedoring in interstate or foreign commerce. App. 17–18.[12]

Petitioner appealed to the Washington Court of Appeals. Record 77. That court certified the case for direct appeal to the State's Supreme Court, citing Wash. Rev. Code § 2.06.030 (c) (1976), and Wash. Supreme Court Rule on Appeal I–14 (1)(c) (now Rule 4.2 (a)(2), Wash. Rules of Court (1977)).

---

[12] In its oral decision the Superior Court noted its doubt about the continued validity of the *Stevedoring Cases:*

"It would seem to the Court . . . that there certainly is a swing away from the Puget Sound and Carter and Weekes cases . . . ." App. 8. "It sticks in this Court's mind, however, that there has to be a reason, of which is beyond the ability of this Court to comprehend, that everyone has shied from the stevedoring cases, and many minds obviously more brilliant than mine have not been able to overturn those cases directly in thirty-eight years . . . ." *Id.*, at 11. "Under those circumstances the Court does hold that the Puget Sound and Carter and Weekes cases are the law of the land, as exemplified by those decisions; that they have not been reversed by implication, nor has there been an invitation to anyone to reverse those cases." *Id.*, at 13–14.

After accepting certification, the Supreme Court, with two justices dissenting, affirmed the judgment of the Superior Court. 88 Wash. 2d 315, 559 P. 2d 997 (1977). The majority considered petitioner's argument that recent cases[13] had eroded the holdings in the *Stevedoring Cases*. It concluded, nonetheless:

> "[W]e must hold the tax invalid; we do so in recognition of our duty to abide by controlling United States Supreme Court decisions construing the federal constitution. Hence, we find it unnecessary to discuss the aforementioned cases beyond the fact that nowhere in them do we find language criticizing, expressly contradicting, or over-ruling (even impliedly) the stevedoring cases.

> .     .     .     .     .

> "Fully mindful of our prior criticism of the principles and reasoning of the stevedore cases (*see Washington-Oregon Shippers Cooperative Ass'n* v. *Schumacher*, 59 Wn. 2d 159, 167, 367 P. 2d 112, 115–116 (1961)), we must nevertheless hold the instant tax on stevedoring invalid." 88 Wash. 2d, at 318–320, 559 P. 2d, at 998–999.

The two dissenting justices would have upheld the tax against the Commerce Clause attack on the ground that recent cases had eroded the direct-indirect taxation analysis employed in the *Stevedoring Cases*. They found no violation of the Import-Export Clause because the State had taxed only the activity of stevedoring, not the imports or exports themselves. Even if stevedoring were considered part of interstate or foreign commerce, the Washington tax was valid because it did not discriminate against importing or exporting, did not impair transportation, did not impose multiple burdens, and did not

---

[13] The court stated, 88 Wash. 2d, at 318, 559 P. 2d, at 998, that petitioner had cited *Michelin Tire Corp.* v. *Wages*, 423 U. S. 276 (1976); *Colonial Pipeline Co.* v. *Traigle*, 421 U. S. 100 (1975); *Canton R. Co.* v. *Rogan*, 340 U. S. 511 (1951); *Interstate Pipe Line Co.* v. *Stone*, 337 U. S. 662 (1949); and *Central Greyhound Lines, Inc.* v. *Mealey*, 334 U. S. 653 (1948).

regulate commerce. 88 Wash. 2d, at 320–322, 559 P. 2d, at 999–1000.

Because of the possible impact on the issues made by our intervening decision in *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274 (1977), filed after the Washington Supreme Court's ruling, we granted certiorari. 434 U. S. 815 (1977).

## II

## The Commerce Clause

### A

In *Puget Sound Stevedoring Co.* v. *State Tax Comm'n*, the Court invalidated the Washington business and occupation tax on stevedoring only because it applied directly to interstate commerce. Stevedoring was interstate commerce, according to the Court, because:

> "Transportation of a cargo by water is impossible or futile unless the thing to be transported is put aboard the ship and taken off at destination. A stevedore who in person or by servants does work so indispensable is as much an agency of commerce as shipowner or master." 302 U. S., at 92.

Without further analysis, the Court concluded:

> "The business of loading and unloading being interstate or foreign commerce, the State of Washington is not at liberty to tax the privilege of doing it by exacting in return therefor a percentage of the gross receipts. Decisions to that effect are many and controlling." *Id.*, at 94.

The petitioners (officers of New York City) in *Joseph* v. *Carter & Weekes Stevedoring Co.*, urged the Court to overrule *Puget Sound*. They argued that intervening cases [14] had per-

---

[14] They cited, among others, four particular cases. The first was *Department of Treasury* v. *Wood Preserving Corp.*, 313 U. S. 62 (1941). In that case the Court sustained an Indiana tax on the gross receipts of a foreign corporation from purchase and resale of timber in Indiana. The

mitted local taxation of gross proceeds derived from interstate commerce. They concluded, therefore, that the Commerce Clause did not preclude the application to stevedoring of the New York City business tax on the gross receipts of a stevedoring corporation. The Court disagreed on the theory that the intervening cases permitted taxation only of local activity separate and distinct from interstate commerce. 330 U. S., at 430–433. This separation theory was necessary, said the Court, because it served to diminish the threat of multiple taxation on commerce; if the tax actually fell on intrastate activity, there was less likelihood that other taxing jurisdictions could duplicate the levy. *Id.*, at 429. Stevedoring, however, was not separated from interstate commerce because, as previously enunciated in *Puget Sound,* it *was* interstate commerce:

> "Stevedoring, we conclude, is essentially a part of the commerce itself and therefore a tax upon its gross receipts or upon the privilege of conducting the business of stevedoring for interstate and foreign commerce, measured by those gross receipts, is invalid. We reaffirm the rule of *Puget Sound Stevedoring Company.* 'What makes the

---

transaction was considered local even though the timber was to be transported, after the resale, to Ohio for creosote treatment by the foreign corporation. The second case was *McGoldrick* v. *Berwind-White Co.,* 309 U. S. 33 (1940). There a Pennsylvania corporation sold coal to New York City consumers through a city sales office. Even though the coal was shipped from Pennsylvania, the Court permitted the city to tax the sale because the tax was conditioned on local activity, that is, the delivery of goods within New York upon their purchase in New York for consumption in New York. The third case was *Southern Pacific Co.* v. *Gallagher,* 306 U. S. 167 (1939). There California was permitted to impose a tax on storage and use with respect to the retention and ownership of goods brought into the State by an interstate railroad for its own use. The fourth was *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250 (1938). There the Court upheld a New Mexico privilege tax upon the gross receipts from the sale of advertising. It concluded that the business was local even though a magazine with interstate circulation and advertising was published.

tax invalid is the fact that there is interference by a State with the freedom of interstate commerce.' *Freeman* v. *Hewit* [329 U. S. 249,] 256." 330 U. S., at 433.

Because the tax in the present case is indistinguishable from the taxes at issue in *Puget Sound* and in *Carter & Weekes,* the *Stevedoring Cases* control today's decision on the Commerce Clause issue unless more recent precedent and a new analysis require rejection of their reasoning.

We conclude that *Complete Auto Transit, Inc.* v. *Brady,* where the Court held that a State under appropriate conditions may tax directly the privilege of conducting interstate business, requires such rejection. In *Complete Auto,* Mississippi levied a gross-receipts tax on the privilege of doing business within the State. It applied the tax to the appellant, a Michigan corporation transporting motor vehicles manufactured outside Mississippi. After the vehicles were shipped into Mississippi by railroad, the appellant moved them by truck to Mississippi dealers. This Court assumed that appellant's activity was in interstate commerce. 430 U. S., at 276 n. 4.

The Mississippi tax survived the Commerce Clause attack. Absolute immunity from state tax did not exist for interstate businesses because it " ' "was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing business." ' " *Id.,* at 288, quoting *Western Live Stock* v. *Bureau of Revenue,* 303 U. S., at 254, and *Colonial Pipeline Co.* v. *Traigle,* 421 U. S. 100, 108 (1975). The Court therefore specifically overruled *Spector Motor Service, Inc.* v. *O'Connor,* 340 U. S. 602 (1951), where a direct gross-receipts tax on the privilege of engaging in interstate commerce had been invalidated. 430 U. S., at 288–289.

The principles of *Complete Auto* also lead us now to question the underpinnings of the *Stevedoring Cases.* First, *Puget Sound* invalidated the Washington tax on stevedoring activity only because it burdened the privilege of engaging in interstate

commerce. Because *Complete Auto* permits a State properly to tax the privilege of engaging in interstate commerce, the basis for the holding in *Puget Sound* is removed completely.[15]

Second, *Carter & Weekes* supported its reaffirmance of *Puget Sound* by arguing that a direct privilege tax would threaten multiple burdens on interstate commerce to a greater extent than would taxes on local activity connected to commerce. But *Complete Auto* recognized that errors of apportionment that may lead to multiple burdens may be corrected when they occur. 430 U. S., at 288–289, n. 15.[16]

The argument of *Carter & Weekes* was an abstraction. No multiple burdens were demonstrated. When a general business tax levies only on the value of services performed within the State, the tax is properly apportioned and multiple bur-

---

[15] That the holding in *Spector* parallels that in *Puget Sound* is demonstrated by the authorities relied upon or provided by both cases in the past. *Spector* relied on *Carter & Weekes,* which reaffirmed *Puget Sound,* and upon *Freeman* v. *Hewit,* 329 U. S. 249 (1946). 340 U. S., at 609. *Freeman,* in turn, relied upon *Puget Sound,* 329 U. S., at 257, and *Carter & Weekes* relied upon *Freeman,* 330 U. S., at 433. Both *Freeman* and *Puget Sound* relied upon *Galveston, H. & S. A. R. Co.* v. *Texas,* 210 U. S. 217 (1908). 329 U. S., at 257; 302 U. S., at 94.

Respondents, also, have observed the parallel between *Spector* and the *Stevedoring Cases.* In their reply brief to the Superior Court, they argued that *Spector,* which had not then been overruled by *Complete Auto,* was dispositive on the question of the continued vitality of *Puget Sound* and *Carter & Weekes.* See n. 11, *supra.*

[16] Subsequent to *Carter & Weekes,* the Court explained more precisely its concern about multiple burdens on interstate commerce:

"While the economic wisdom of state net income taxes is one of state policy not for our decision, one of the 'realities' raised by the parties is the possibility of a multiple burden resulting from the exactions in question. The answer is that none is shown to exist here. . . . Logically it is impossible, when the tax is fairly apportioned, to have the same income taxed twice. . . . We cannot deal in abstractions. In this type of case the taxpayers must show that the formula places a burden upon interstate commerce in a constitutional sense. This they have failed to do." *Northwestern Cement Co.* v. *Minnesota,* 358 U. S. 450, 462–463 (1959).

dens logically cannot occur.[17] The reasoning of *Carter &
Weekes,* therefore, no longer supports automatic tax immunity for stevedoring from a levy such as the Washington business and occupation tax.

Third, *Carter & Weekes* reaffirmed *Puget Sound* on a basis rejected by *Complete Auto* and previous cases. *Carter & Weekes* considered *any* direct tax on interstate commerce to be unconstitutional because it burdened or interfered with commerce. 330 U. S., at 433. In support of that conclusion, the Court there cited only *Southern Pacific Co.* v. *Arizona ex rel. Sullivan,* 325 U. S. 761, 767 (1945), the case where Arizona's limitations on the length of trains were invalidated. In *Southern Pacific,* however, the Court had not struck down the legislation merely because it burdened interstate commerce. Instead, it weighed the burden against the State's interests in limiting the size of trains:

> "The decisive question is whether in the circumstances the total effect of the law as a safety measure in reducing accidents and casualties is so slight or problematical as not to outweigh the national interest in keeping interstate commerce free . . . ." *Id.,* at 775–776.

Only after concluding that railroad safety was not advanced by the regulations, did the Court invalidate them. They contravened the Commerce Clause because the burden on interstate commerce outweighed the State's interests.

---

[17] *Carter & Weekes* has received criticism from commentators for its reliance on the possibility of the imposition of multiple tax burdens. Professor Hartman argued that the burden on interstate commerce imposed by a privilege tax "is multiple only because the elements of transportation itself are multiple." P. Hartman, State Taxation of Interstate Commerce 204 (1953). Because the loading or unloading of a ship is confined to one State, no other State could tax that particular phase of commerce. "Thus, the Court's basis for the unconstitutionality of the *Weekes* tax assumed the existence of a premise which did not exist, except in the mind of a majority of the Justices." *Id.,* at 205. See Hellerstein, State Taxation Under the Commerce Clause: An Historical Perspective, 29 Vand. L. Rev. 335 (1976).

Although the balancing of safety interests naturally differs from the balancing of state financial needs, *Complete Auto* recognized that a State has a significant interest in exacting from interstate commerce its fair share of the cost of state government. 430 U. S., at 288. Accord, *Colonial Pipeline Co.* v. *Traigle,* 421 U. S., at 108; *Western Live Stock* v. *Bureau of Revenue,* 303 U. S., at 254. All tax burdens do not impermissibly impede interstate commerce. The Commerce Clause balance tips against the tax only when it unfairly burdens commerce by exacting more than a just share from the interstate activity. Again, then, the analysis of *Carter & Weekes* must be rejected.

## B

Respondents' additional arguments do not demonstrate the wisdom of, or need for, preserving the *Stevedoring Cases.* First, respondents attempt to distinguish so-called movement cases, in which tax immunity has been broad, from nonmovement cases, in which the immunity traditionally has been narrower. Brief for Respondents 23–28. Movement cases involve taxation on transport, such as the Texas tax on a natural gas pipeline in *Michigan-Wisconsin Pipe Line Co.* v. *Calvert,* 347 U. S. 157 (1954). Nonmovement cases involve taxation on commerce that does not move goods, such as the New Mexico tax on publishing newspapers and magazines in *Western Live Stock* v. *Bureau of Revenue.* This distinction, however, disregards *Complete Auto,* a movement case which held that a state privilege tax on the business of moving goods in interstate commerce is not *per se* unconstitutional.

Second, respondents would distinguish *Complete Auto* on the ground that it concerned only intrastate commerce, that is, the movement of vehicles from a Mississippi railhead to Mississippi dealers. Brief for Respondents 26–28. This purported distinction ignores two facts. In *Complete Auto,* we expressly assumed that the activity was interstate, a segment of the movement of vehicles from the out-of-state manufac-

turer to the in-state dealers. 430 U. S., at 276 n. 4. Moreover, the stevedoring activity of respondents occurs completely within the State of Washington, even though the activity is a part of interstate or foreign commerce. The situation was the same in *Complete Auto,* and that case, thus, is not distinguishable from the present one.

Third, respondents suggest that what they regard as such an important change in Commerce Clause jurisprudence should come from Congress and not from this Court. To begin with, our rejection of the *Stevedoring Cases* does not effect a significant present change in the law. The primary alteration occurred in *Complete Auto.* Even if this case did effect an important change, it would not offend the separation-of-powers principle because it does not restrict the ability of Congress to regulate commerce. The Commerce Clause does not state a prohibition; it merely grants specific power to Congress. The prohibitive effect of the Clause on state legislation results from the Supremacy Clause and the decisions of this Court. See, *e. g., Cooley* v. *Board of Wardens,* 12 How. 299 (1852); *Gibbons* v. *Ogden,* 9 Wheat. 1 (1824). If Congress prefers less disruption of interstate commerce, it will act.[18]

Consistent with *Complete Auto,* then, we hold that the Washington business and occupation tax does not violate the

---

[18] Respondents seem to be particularly concerned about the continued validity of *Michigan-Wisconsin Pipe Line Co.* v. *Calvert,* 347 U. S. 157 (1954). There, Texas levied a tax on the production of natural gas measured by the entire volume of gas to be shipped in interstate commerce. A refinery extracted the gas from crude oil and transported it 300 yards to the pipeline. The State identified, as a local incident, the transfer of gas from the refinery to the pipeline. This Court declared the tax unconstitutional because it amounted to an unapportioned levy on the transportation of the entire volume of gas. The exaction did not relate to the length of the Texas portion of the pipeline or to the percentage of the taxpayer's business taking place in Texas. Today's decision does not question the *Michigan-Wisconsin* judgment, because Washington apportions its business and occupation tax to activity within the State. Taxes that are not so apportioned remain vulnerable to Commerce Clause attack.

Commerce Clause by taxing the interstate commerce activity of stevedoring. To the extent that *Puget Sound Stevedoring Co.* v. *State Tax Comm'n* and *Joseph* v. *Carter & Weekes Stevedoring Co.* stand to the contrary, each is overruled.

## C

With the distinction between direct and indirect taxation of interstate commerce thus discarded, the constitutionality under the Commerce Clause of the application of the Washington business and occupation tax to stevedoring depends upon the practical effect of the exaction. As was recognized in *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250 (1938), interstate commerce must bear its fair share of the state tax burden. The Court repeatedly has sustained taxes that are applied to activity with a substantial nexus with the State, that are fairly apportioned, that do not discriminate against interstate commerce, and that are fairly related to the services provided by the State. *E. g., General Motors Corp.* v. *Washington,* 377 U. S. 436 (1964); *Northwestern Cement Co.* v. *Minnesota,* 358 U. S. 450 (1959); *Memphis Gas Co.* v. *Stone,* 335 U. S. 80 (1948); *Wisconsin* v. *J. C. Penney Co.,* 311 U. S. 435 (1940); see *Complete Auto Transit, Inc.* v. *Brady,* 430 U. S., at 279, and n. 8.

Respondents proved no facts in the Superior Court that, under the above test, would justify invalidation of the Washington tax. The record contains nothing that minimizes the obvious nexus between Washington and respondents; indeed, respondents conduct their entire stevedoring operations within the State. Nor have respondents successfully attacked the apportionment of the Washington system. The tax under challenge was levied solely on the value of the loading and unloading that occurred in Washington. Although the rate of taxation varies with the type of business activity, respondents have not demonstrated how the 1% rate, which applies to them and generally to businesses rendering services, discriminates against interstate commerce. Finally, nothing in the

record suggests that the tax is not fairly related to services and protection provided by the State. In short, because respondents relied below on the *per se* approach of *Puget Sound* and *Carter & Weekes*, they developed no factual basis on which to declare the Washington tax unconstitutional as applied to their members and their stevedoring activities.

## III

### The Import-Export Clause

Having decided that the Commerce Clause does not *per se* invalidate the application of the Washington tax to stevedoring, we must face the question whether the tax contravenes the Import-Export Clause. Although the parties dispute the meaning of the prohibition of "Imposts or Duties on Imports or Exports," they agree that it differs from the ban the Commerce Clause erects against burdens and taxation on interstate commerce. Brief for Petitioner 32–33; Brief for Respondents 9–10; Tr. of Oral Arg. 13, 22. The Court has noted before that the Import-Export Clause states an absolute ban, whereas the Commerce Clause merely grants power to Congress. *Richfield Oil Corp.* v. *State Board,* 329 U. S. 69, 75 (1946). On the other hand, the Commerce Clause touches all state taxation and regulation of interstate and foreign commerce, whereas the Import-Export Clause bans only "Imposts or Duties on Imports or Exports." *Michelin Tire Corp.* v. *Wages,* 423 U. S. 276, 279, 290–294 (1976). The resolution of the Commerce Clause issue, therefore, does not dispose of the Import-Export Clause question.

### A

In *Michelin* the Court upheld the application of a general ad valorem property tax to imported tires and tubes. The Court surveyed the history and purposes of the Import-Export Clause to determine, for the first time, which taxes fell within the absolute ban on "Imposts or Duties." *Id.,* at 283–286.

Previous cases had assumed that all taxes on imports and exports and on the importing and exporting processes were banned by the Clause. See, *e. g., Department of Revenue* v. *James B. Beam Distilling Co.,* 377 U. S. 341, 343 (1964); *Richfield Oil Corp.* v. *State Board,* 329 U. S., at 76; *Joseph* v. *Carter & Weekes Stevedoring Co.,* 330 U. S., at 445 (Douglas, J., dissenting in part); *Anglo-Chilean Corp.* v. *Alabama,* 288 U. S. 218, 226–227 (1933); *License Cases,* 5 How. 504, 575–576 (1847) (opinion of Taney, C. J.). Before *Michelin,* the primary consideration was whether the tax under review reached imports or exports. With respect to imports, the analysis applied the original-package doctrine of *Brown* v. *Maryland,* 12 Wheat. 419 (1827); see, *e. g., Department of Revenue* v. *James B. Beam Distilling Co.; Anglo-Chilean Corp.* v. *Alabama; Low* v. *Austin,* 13 Wall. 29 (1872), overruled in *Michelin Tire Corp.* v. *Wages.* So long as the goods retained their status as imports by remaining in their import packages, they enjoyed immunity from state taxation. With respect to exports, the dispositive question was whether the goods had entered the "export stream," the final, continuous journey out of the country. *Kosydar* v. *National Cash Register Co.,* 417 U. S. 62, 70–71 (1974); *Empresa Siderurgica* v. *County of Merced,* 337 U. S. 154, 157 (1949); *A. G. Spalding & Bros.* v. *Edwards,* 262 U. S. 66, 69 (1923); *Coe* v. *Errol,* 116 U. S. 517, 526, 527 (1886). As soon as the journey began, tax immunity attached.

*Michelin* initiated a different approach to Import-Export Clause cases. It ignored the simple question whether the tires and tubes were imports. Instead, it analyzed the nature of the tax to determine whether it was an "Impost or Duty." 423 U. S., at 279, 290–294. Specifically, the analysis examined whether the exaction offended any of the three policy considerations leading to the presence of the Clause:

"The Framers of the Constitution thus sought to alleviate three main concerns . . . : the Federal Govern-

ment must speak with one voice when regulating commercial relations with foreign governments, and tariffs, which might affect foreign relations, could not be implemented by the States consistently with that exclusive power; import revenues were to be the major source of revenue of the Federal Government and should not be diverted to the States; and harmony among the States might be disturbed unless seaboard States, with their crucial ports of entry, were prohibited from levying taxes on citizens of other States by taxing goods merely flowing through their ports to the other States not situated as favorably geographically." *Id.*, at 285–286 (footnotes omitted).

The ad valorem property tax there at issue offended none of these policies. It did not usurp the Federal Government's authority to regulate foreign relations since it did not "fall on imports as such because of their place of origin." *Id.*, at 286. As a general tax applicable to all property in the State, it could not have been used to create special protective tariffs and could not have been applied selectively to encourage or discourage importation in a manner inconsistent with federal policy. Further, the tax deprived the Federal Government of no revenues to which it was entitled. The exaction merely paid for services, such as fire and police protection, supplied by the local government. Although the tax would increase the cost of the imports to consumers, its effect on the demand for Michelin tubes and tires was insubstantial. The tax, therefore, would not significantly diminish the number of imports on which the Federal Government could levy import duties and would not deprive it of income indirectly. Finally, the tax would not disturb harmony among the States because the coastal jurisdictions would receive compensation only for services and protection extended to the imports. Although intending to prevent coastal States from abusing their geographical positions, the Framers also did not expect residents

of the ports to subsidize commerce headed inland. The Court therefore concluded that the Georgia ad valorem property tax was not an "Impost or Duty," within the meaning of the Import-Export Clause, because it offended none of the policies behind that Clause.

A similar approach demonstrates that the application of the Washington business and occupation tax to stevedoring threatens no Import-Export Clause policy. First, the tax does not restrain the ability of the Federal Government to conduct foreign policy. As a general business tax that applies to virtually all businesses in the State, it has not created any special protective tariff. The assessments in this case are only upon business conducted entirely within Washington. No foreign business or vessel is taxed. Respondents, therefore, have demonstrated no impediment posed by the tax upon the regulation of foreign trade by the United States.

Second, the effect of the Washington tax on federal import revenues is identical to the effect in *Michelin*. The tax merely compensates the State for services and protection extended by Washington to the stevedoring business. Any indirect effect on the demand for imported goods because of the tax on the value of loading and unloading them from their ships is even less substantial than the effect of the direct ad valorem property tax on the imported goods themselves.

Third, the desire to prevent interstate rivalry and friction does not vary significantly from the primary purpose of the Commerce Clause. See P. Hartman, State Taxation of Interstate Commerce 2–3 (1953).[19] The third Import-Export Clause policy, therefore, is vindicated if the tax falls upon a

---

[19] "Two of the chief weaknesses of the Articles of Confederation were the lack of power in Congress to regulate foreign and interstate commerce, and the presence of power in the States to do so. The almost catastrophic results from this sort of situation were harmful commercial wars and reprisals at home among the States . . . ." P. Hartman, State Taxation of Interstate Commerce 2 (1953), citing, *e. g.*, The Federalist Nos. 7, 11, 22 (Hamilton), No. 42 (Madison).

taxpayer with reasonable nexus to the State, is properly apportioned, does not discriminate, and relates reasonably to services provided by the State. As has been explained in Part II–C, *supra,* the record in this case, as presently developed, reveals the presence of all these factors.

Under the analysis of *Michelin,* then, the application of the Washington business and occupation tax to stevedoring violates no Import-Export Clause policy and therefore should not qualify as an "Impost or Duty" subject to the absolute ban of the Clause.

## B

The Court in *Michelin* qualified its holding with the observation that Georgia had applied the property tax to goods "no longer in transit." 423 U. S., at 302.[20] Because the goods were no longer in transit, however, the Court did not have to face the question whether a tax relating to goods in transit would be an "Impost or Duty" even if it offended none of the policies behind the Clause. Inasmuch as we now face this inquiry, we note two distinctions between this case and *Michelin.* First, the activity taxed here occurs while imports and exports are in transit. Second, however, the tax does not fall on the goods themselves. The levy reaches only the business of loading and unloading ships or, in other words, the business of transporting cargo within the State of Washington. Despite the existence of the first distinction, the presence of the second leads to the conclusion that the Washington tax is not a prohibited "Impost or Duty" when it violates none of the policies.

In *Canton R. Co.* v. *Rogan,* 340 U. S. 511 (1951), the Court upheld a gross-receipts tax on a steam railroad operating

---

[20] Commentators have noted the qualification but have questioned its significance. See W. Hellerstein, Michelin Tire Corp. v. Wages: Enhanced State Power to Tax Imports, 1976 S. Ct. Rev. 99, 122–126; Comment, 30 Rutgers L. Rev. 193, 203 (1976); Note, 12 Wake Forest L. Rev. 1055, 1062 (1976).

exclusively within the Port of Baltimore. The railroad operated a marine terminal and owned rail lines connecting the docks to the trunk lines of major railroads. It switched and pulled cars, stored imports and exports pending transport, supplied wharfage, weighed imports and exports, and rented a stevedoring crane. Somewhat less than half of the company's 1946 gross receipts were derived from the transport of imports or exports. The company contended that this income was immune, under the Import-Export Clause, from the state tax. The Court rejected that argument primarily on the ground that immunity of services incidental to importing and exporting was not so broad as the immunity of the goods themselves: [21]

> "The difference is that in the present case the tax is not on the *goods* but on the *handling* of them at the port. An article may be an export and immune from a tax long before or long after it reaches the port. But when the tax is on activities connected with the export or import the range of immunity cannot be so wide.

[21] The Court distinguished the Maryland tax from others struck down by the Court. 340 U. S., at 513–514, distinguishing *Richfield Oil Corp.* v. *State Board,* 329 U. S. 69 (1946); *Thames & Mersey Ins. Co.* v. *United States,* 237 U. S. 19 (1915); and *Fairbank* v. *United States,* 181 U. S. 283 (1901). In these cases the State had taxed either the goods or activity so connected with the goods that the levy amounted to a tax on the goods themselves. In *Richfield,* the tax fell upon the sale of goods and was overturned because the Court had always considered a tax on the sale of goods to be a tax on the goods themselves. See *Brown* v. *Maryland,* 12 Wheat. 419, 439 (1827). The sale had no value or significance apart from the goods. Similarly, the stamp tax on bills of lading in *Fairbank* effectively taxed the goods because the bills represented the goods. The basis for distinguishing *Thames & Mersey* is less clear because there the tax fell upon marine insurance policies. Arguably, the policies had a value apart from the value of the goods. In distinguishing that case from the taxation of stevedoring activities, however, one might note that the value of goods bears a much closer relation to the value of insurance policies on them than to the value of loading and unloading ships.

". . . The broader definition which appellant tenders distorts the ordinary meaning of the terms. It would lead back to every forest, mine, and factory in the land and create a zone of tax immunity never before imagined." *Id.*, at 514–515 (emphasis in original).

In *Canton R. Co.* the Court did not have to reach the question about taxation of stevedoring because the company did not load or unload ships.[22] As implied in the opinion, however, *id.*, at 515, the only distinction between stevedoring and the railroad services was that the loading and unloading of ships crossed the waterline. This is a distinction without economic significance in the present context. The transportation services in both settings are necessary to the import-export process. Taxation in neither setting relates to the value of the goods, and therefore in neither can it be considered taxation upon the goods themselves. The force of *Canton R. Co.* therefore prompts the conclusion that the *Michelin* policy analysis should not be discarded merely because the goods are in transit, at least where the taxation falls upon a service distinct from the goods and their value.[23]

## C

Another factual distinction between this case and *Michelin* is that here the stevedores load and unload imports and exports

---

[22] The Court expressly noted that it did not need to reach the stevedoring issue. 340 U. S., at 515. It was also reserved in the companion case of *Western Maryland R. Co.* v. *Rogan,* 340 U. S. 520, 522 (1951).

[23] We do not reach the question of the applicability of the *Michelin* approach when a State directly taxes imports or exports in transit.

Our Brother POWELL, as his concurring opinion indicates, obviously would prefer to reach the issue today, even though the facts of the present case, as he agrees, do not present a case of a tax on goods in transit. As in *Michelin,* decided less than three years ago, we prefer to defer decision until a case with pertinent facts is presented. At that time, with full argument, the issue with all its ramifications may be decided.

whereas in *Michelin* the Georgia tax touched only imports. As noted in Part III–A, *supra,* the analysis in the export cases has differed from that in the import cases. In the former, the question was when did the export enter the export stream; in the latter, the question was when did the goods escape their original package. The questions differed, for example, because an export could enter its export package and not secure tax immunity until later when it began its journey out of the country. Until *Michelin,* an import retained its immunity so long as it remained in its original package.

Despite these formal differences, the *Michelin* approach should apply to taxation involving exports as well as imports. The prohibition on the taxation of exports is contained in the same Clause as that regarding imports. The export-tax ban vindicates two of the three policies identified in *Michelin.* It precludes state disruption of the United States foreign policy.[24] It does not serve to protect federal revenues, however, because the Constitution forbids federal taxation of exports. U. S. Const., Art. I, § 9, cl. 5;[25] see *United States* v. *Hvoslef,* 237 U. S. 1 (1915). But it does avoid friction and trade barriers among the States. As a result, any tax relating to exports can be tested for its conformance with the first and third policies. If the constitutional interests are not disturbed, the tax should not be considered an "Impost or Duty" any more than should a tax related to imports. This approach is consistent with *Canton R. Co.,* which permitted taxation of income from services connected to both imports and exports. The respondents' gross receipts from loading exports, therefore, are as subject to the Washington business and occupation tax as are the receipts from unloading imports.

---

[24] See Abramson, State Taxation of Exports: The Stream of Constitutionality, 54 N. C. L. Rev. 59 (1975).

[25] "No Tax or Duty shall be laid on Articles exported from any State."

## D

None of respondents' additional arguments convinces us that the *Michelin* approach should not be applied in this case to sustain the tax.

First, respondents contend that the Import-Export Clause effects an absolute prohibition on all taxation of imports and exports. The ban must be absolute, they argue, in order to give the Clause meaning apart from the Commerce Clause. They support this contention primarily with dicta from *Richfield Oil*, 329 U. S., at 75–78, and with the partial dissent in *Carter & Weekes*, 330 U. S., at 444–445. Neither, however, provides persuasive support because neither recognized that the term "Impost or Duty" is not self-defining and does not necessarily encompass all taxes. The partial dissent in *Carter & Weekes* did not address the term at all. *Richfield Oil's* discussion was limited to the question whether the tax fell upon the sale or upon the right to retail. 329 U. S., at 83–84. The State apparently conceded that the Clause precluded all taxes on exports and the process of exporting. *Id.*, at 84. The use of these two cases, therefore, ignores the central holding of *Michelin* that the absolute ban is only of "Imposts or Duties" and not of all taxes. Further, an absolute ban of all taxes is not necessary to distinguish the Import-Export Clause from the Commerce Clause. Under the *Michelin* approach, any tax offending either of the first two Import-Export policies becomes suspect regardless of whether it creates interstate friction. Commerce Clause analysis, on the other hand, responds to neither of the first two policies. Finally, to conclude that "Imposts or Duties" encompasses all taxes makes superfluous several of the terms of Art. I, § 8, cl. 1, of the Constitution, which grants Congress the "Power To lay and collect Taxes, Duties, Imposts and Excises." In particular, the Framers apparently did not include "Excises," such as an exaction on the privilege of doing business, within the scope of "Imposts" or "Duties." See *Michelin*, 423 U. S., at 291–292, n. 12, citing

2 M. Farrand, The Records of the Federal Convention of 1787, p. 305 (1911), and 3 *id.*, at 203–204.[26]

Second, respondents would distinguish *Michelin* on the ground that Georgia levied a property tax on the mass of goods in the State, whereas Washington would tax the imports themselves while they remain a part of commerce. This distinction is supported only by citation to the *License Cases,* 5 How., at 576 (opinion of Taney, C. J.). The argument must be rejected, however, because it resurrects the original-package analysis. See *id.,* at 574–575. Rather than examining whether the taxes are "Imposts or Duties" that offend constitutional policies, the contention would have the Court explore when goods lose their status as imports and exports. This is precisely the inquiry the Court abandoned in *Michelin,* 423 U. S., at 279. Nothing in the *License Cases,* in which a fractioned Court produced nine opinions, prompts a return to the exclusive consideration of what constitutes an import or export.

Third, respondents submit that the Washington tax imposes a transit fee upon inland consumers. Regardless of the validity of such a toll under the Commerce Clause, respondents conclude that it violates the Import-Export Clause. The problem with that analysis is that it does not explain how the policy of preserving harmonious commerce among the States and of preventing interstate tariffs, rivalries, and friction, differs as between the two Clauses. After years of development of Commerce Clause jurisprudence, the Court has concluded that interstate friction will not chafe when commerce pays for the governmental services it enjoys. See Part II, *supra.* Requiring coastal States to subsidize the commerce of inland consumers may well exacerbate, rather than diminish,

---

[26] But see 1 W. Crosskey, Politics and the Constitution in the History of the United States 296–297 (1953), cited in 423 U. S., at 290–291, in which the author argues that the concept of "Duties" encompassed excises. He does not explain, however, why Art. I, § 8, cl. 1, enumerated "Taxes, Duties, Imposts and Excises" if the Framers intended duties to include excises.

rivalries and hostility. Fair taxation will be assured by the prohibition on discrimination and the requirements of apportionment, nexus, and reasonable relationship between tax and benefits. To the extent that the Import-Export Clause was intended to preserve interstate harmony, the four safeguards will vindicate the policy. To the extent that other policies are protected by the Import-Export Clause, the analysis of an Art. I, § 10, challenge must extend beyond that required by a Commerce Clause dispute. But distinctions not based on differences in constitutional policy are not required. Because respondents identify no such variation in policy, their transit-fee argument must be rejected.

### E

The Washington business and occupation tax, as applied to stevedoring, reaches services provided wholly within the State of Washington to imports, exports, and other goods. The application violates none of the constitutional policies identified in *Michelin*. It is, therefore, not among the "Imposts or Duties" within the prohibition of the Import-Export Clause.

### IV

The judgment of the Supreme Court of Washington is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.[27]

*It is so ordered.*

Mr. Justice Brennan took no part in the consideration or decision of this case.

Mr. Justice Powell, concurring in part and concurring in the result.

I join the opinion of the Court with the exception of Part III-B. As that section of the Court's opinion appears to

---

[27] See generally Hellerstein, State Taxation and the Supreme Court: Toward a More Unified Approach to Constitutional Adjudication?, 75 Mich. L. Rev. 1426 (1977).

resurrect the discarded "direct-indirect" test, I cannot join it.

In *Michelin Tire Corp.* v. *Wages,* 423 U. S. 276 (1976), this Court abandoned the traditional, formalistic methods of determining the validity of state levies under the Import-Export Clause and applied a functional analysis based on the exaction's relationship to the three policies that underlie the Clause: (i) preservation of uniform federal regulation of foreign relations; (ii) protection of federal revenue derived from imports; and (iii) maintenance of harmony among the inland States and the seaboard States. The nondiscriminatory ad valorem property tax in *Michelin* was held not to violate any of those policies, but the Court suggested that even a nondiscriminatory tax on goods merely in transit through the State might run afoul of the Import-Export Clause.

The question the Court addresses today in Part III–B is whether the business tax at issue here is such a tax upon goods in transit. The Court gives a negative answer, apparently for two reasons. The first is that *Canton R. Co.* v. *Rogan,* 340 U. S. 511 (1951), indicates that this is a tax "not on the *goods* but on the *handling* of them at the port." *Id.,* at 514 (emphasis in original). While *Canton R. Co.* provides precedential support for the proposition that a tax of this kind is not invalid under the Import-Export Clause, its rather artificial distinction between taxes on the handling of the goods and taxes on the goods themselves harks back to the arid "direct-indirect" distinction that we rejected in *Complete Auto Transit, Inc.* v. *Brady,* 430 U. S. 274 (1977), in favor of analysis framed in light of economic reality.

The Court's second reason for holding that the instant tax is not one on goods in transit has the surface appearance of economic-reality analysis, but turns out to be the "direct-indirect" test in another guise. The Court likens this tax to the one at issue in *Canton R. Co.* and declares that since "[t]axation in neither setting relates to the value of the goods, . . . in neither can it be considered taxation upon the goods themselves."

*Ante,* at 757. That this distinction has no economic signifi-
cance is apparent from the fact that it is possible to design
transit fees that are imposed "directly" upon the goods, even
though the amount of the exaction bears no relation to the
value of the goods. For example, a State could levy a transit
fee of $5 per ton or $10 per cubic yard. These taxes would
bear no more relation to the value of the goods than does the
tax at issue here, which is based on the volume of the steve-
doring companies' business, and, in turn, on the volume of
goods passing through the port. Thus, the Court does not
explain satisfactorily its pronouncement that Washington's
business tax upon stevedoring—in economic terms—is not the
type of transit fee that the *Michelin* Court questioned.

In my view, this issue can be resolved only with refer-
ence to the analysis adopted in *Michelin.* The Court's initial
mention of the validity of transit fees in that decision is
found in a discussion concerning the right of the taxing state
to seek a *quid pro quo* for benefits conferred by the State:

> "There is no reason why local taxpayers should subsidize
> the services used by the importer; ultimate consumers
> should pay for such services as police and fire protection
> accorded the goods just as much as they should pay trans-
> portation costs associated with those goods. An evil to
> be prevented by the Import-Export Clause was the levy-
> ing of taxes which could only be imposed because of the
> peculiar geographical situation of certain States that ena-
> bled them to single out goods destined for other States.
> In effect, the Clause was fashioned to prevent the imposi-
> tion of exactions which were no more than transit fees
> on the privilege of moving through a State. [The tax at
> issue] obviously stands on a different footing, and to the
> extent there is any conflict whatsoever with this purpose
> of the Clause, it may be secured merely by prohibiting the
> assessment of even nondiscriminatory property taxes on
> goods which are merely in transit through the State when

the tax is assessed." 423 U. S., at 289–290. (Footnotes omitted.)

In questioning the validity of "transit fees," the *Michelin* Court was concerned with exactions that bore no relation to services and benefits conferred by the State. Thus, the transit-fee inquiry cannot be answered by determining whether or not the tax relates to the value of the goods; instead, it must be answered by inquiring whether the State is simply making the imported goods pay their own way, as opposed to exacting a fee merely for "the privilege of moving through a State." *Ibid.*

The Court already has answered that question in this case. In Part II–C, the Court observes that "nothing in the record suggests that the tax is not fairly related to services and protection provided by the State." *Ante,* at 750–751. Since the stevedoring companies undoubtedly avail themselves of police and fire protection, as well as other benefits Washington offers its local businesses, this statement cannot be questioned. For that reason, I agree with the Court's conclusion that the business tax at issue here is not a "transit fee" within the prohibition of the Import-Export Clause.