OPINION
{¶ 1} This appeal, having been heretofore placed on the accelerated calendar, is being considered pursuant to App.R. 11.1(E) and Local Rule 12. Pursuant to Local Rule 12(5), we have elected to issue a full opinion in lieu of a judgment entry.
 {¶ 2} The appellant/defendant, the Ohio Department of Agriculture (ODA), appeals the judgment of the Defiance County Court of Common Pleas, finding for the appellee/plaintiff, Diehl, Inc., on an appeal from a revocation of its license to processes manufactured milk. Based on the following, we hereby reverse the decision of the trial court.
 {¶ 3} The facts in this case are not in dispute. Diehl, Inc. is licensed by the ODA to process manufactured milk in the State of Ohio. It is a family-owned business that was established in 1870. Principally a manufacturer of condensed milk, the company operates plants in both Ohio and Michigan. Diehl purchases manufactured milk from Michigan, Indiana, and New York, as well as from in-state producers, for use in its Ohio plant.
 {¶ 4} The Dairy Division of ODA was formed to regulate the milk producing and processing industry and to protect Ohio consumers from adulterated milk products. Under the regulatory scheme, the operation of the Dairy Division is funded in part by the Ohio General Revenue Fund and the balance of the moneys needed for its operation comes from fees assessed against Ohio participants in the dairy industry. These fees include flat fees and licensing fees levied against receiving stations, transfer stations, and haulers, along with the fees at issue in the instant case.
 {¶ 5} Beginning in June of 1998, the Milk Sanitation Board, part of the Dairy Division of ODA, began to require manufactured milk processors like the appellee to pay milk inspection fees in accordance with a fee schedule. R.C. 917.031, the statute that establishes the inspection fees, reads in relevant part as follows: "The milk sanitation board * * * shall prescribe inspection fees for milk producers and milk processors, and may prescribe inspection fees for milk haulers * * *. The board may modify any fees it has prescribed. The fees prescribed or modified by the board together with the license fee collected pursuant to this chapter shall not exceed sixty-three per cent of the estimated cost of administering and enforcing this chapter, as determined by the board's review of the director's annual report."
 {¶ 6} The processors' monthly fees are calculated by applying a factor to the total amount of dairy product, raw Grade A and raw manufactured milk/milk equivalent, received and/or utilized by the processors in the previous month. After the factor is applied to the pounds of milk reported by the processor, the monthly obligation is imposed, less any credit for full inspections conducted by the United States Department of Agriculture. All the fees collected are rolled back into the operation of the Dairy Division and if fees are collected in excess of what is needed to fund the program, no fees are collected the following month(s). According to ODA, the fees were instituted as a public health measure, to ensure the quality of manufactured milk products.
 {¶ 7} In September of 1998 and each month thereafter, Diehl failed to pay all of the fees that it owed. Specifically, Diehl only paid fees for the portion of manufactured milk that it received from Ohio producers. On May 12, 1999, the ODA sent Diehl a warning letter and a request for delinquent fees. When Diehl failed to comply within the specified time period, the ODA sought to revoke its license. Upon Diehl's timely request, a hearing on the matter was held on June 28, 1999. Based on the evidence presented at that hearing, the hearing examiner recommended that Diehl lose its license and, on August 11, 1999, the ODA ordered revocation.
 {¶ 8} Diehl timely appealed the license revocation to the Court of Common Pleas for Defiance County. The court found for Diehl, determining that the statutory fee schedule imposed by ODA created an unconstitutional burden on interstate commerce. ODA filed the instant appeal from that decision, raising one assignment of error for our review.
 Assignment of Error {¶ 9} "The lower court erred when it found that the fees [sic] structure adopted by the milk sanitation board and utilized by the Ohio Department of Agriculture was an unconstitutional burden on interstate commerce."
 {¶ 10} This case is an appeal from a common pleas review of an agency decision. Thus, to the extent that an agency's decision is based upon the construction of the state or federal Constitution, a statute, or case law, an appellate court reviews the common pleas decision denovo.[1]
 {¶ 11} The Commerce Clause of the United State Constitution authorizes "Congress to enact laws for the protection and encouragement of commerce among the States,"[2] and also to create "an area of trade free from interference by States * * * [.]"[3] Therefore, as interpreted by case law, "the Commerce Clause even without implementing legislation by Congress is a limitation upon the power of the States."[4]
Accordingly, the so-called dormant commerce clause stands for the proposition that, even in areas where the federal government has not legislated, a state or local law can be challenged on the grounds that it unduly burdens interstate commerce.[5] "This `negative' aspect of the Commerce Clause prohibits economic protectionism — that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors * * *."[6] In spite of this rule of law, states retain "broad power" to legislate for the well-being of their citizenry in areas of local concern including public health.[7]
 {¶ 12} Generally, laws challenged under the dormant commerce clause fall into two categories: those that blatantly, or facially, discriminate against interstate commerce and those that are facially neutral.[8] A facially discriminatory law is one that, by its terms, draws a distinction between in-staters and out-of-staters.[9] Laws of this nature are subject to very high scrutiny and are regularly declared unconstitutional. On the other hand, a facially neutral law, one that appears neutral by its terms, may still have a discriminatory purpose and/or effect as it is applied.[10]
 {¶ 13} Diehl concedes that the instant statute does not in explicit terms discriminate against out-of-state interests, in that it assesses fees equally against milk product purchased from both in-state and out-of-state producers of manufactured milk. Nevertheless, Diehl argues that Ohio's inspection fees are discriminatory both in purpose and in effect. The crux of Diehl's argument is that because milk product produced out-of-state is also inspected in the state of origin, it is assessed a fee twice, once for the inspection in its home state and again in Ohio. The effect of this, according to Diehl, is to make milk product from out-of-state producers more costly than that from in-state producers, thus giving Ohio producers an economic and competitive advantage in the state's market. Diehl also points out that Ohio does not contribute to the costs of milk inspection in other states, nor does it use any of the fees it collects to inspect out-of-state farms.
 {¶ 14} When determining the constitutionality of facially-neutral state statutes, the Supreme Court of the United States has announced the following standard: "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."[11] If a legitimate local purpose for the statute is found, then the rest of the analysis is a question of degree and "`the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activity."[12]
 {¶ 15} At the ODA administrative hearing on this matter, Mr. Charles A. Twining, Secretary of the Milk Sanitation Board, testified that the purpose behind the milk inspections and the fees assessed in support thereof is "ensuring to the consuming public that the products produced and processed in the state of Ohio are safe and wholesome." Diehl, on the other hand, contends that the inspection fee is little more than a tax on out-of-state milk products which ODA has instituted in an attempt to protect Ohio producers from foreign competition under the guise of health regulations. Thus, we must determine, first, whether there is any actual local benefit derived from the inspection fees and, second, whether the added cost imputed to out-of-state manufactured milk products by the inspection fee is clearly excessive in relation to the purported benefit of ensuring unadulterated milk products.
 {¶ 16} This case is particularly difficult in that our analysis leads us to the conclusion that both the putative local benefits and the resulting burden on interstate commerce are relatively trivial. It is well-settled that a state may regulate the milk industry within its borders as an exercise of police power to ensure its citizens' health and safety.[13] However, Diehl claims that the Ohio inspections are redundant because all of the milk product purchased from Indiana, Michigan, and New York is inspected in its home state as well. Indeed, the record suggests that all three of the states conduct inspections of manufactured milk products. In the case of Indiana, Mr. Twining conceded that their inspections were conducted in much the same fashion as are the Ohio inspections. And, in its brief to the trial court, the DOA acknowledged that other dairy producing states conduct their own inspections. However, there are no national standards for manufactured milk product and there is little evidence in the record regarding the standards required by other states. Both Diehl and DOA testified at the hearing that they receive no assurances from the other states' inspection programs regarding the quality of their manufactured milk product. Therefore, although it seems commonsensical that other states would want to ensure the wholesomeness of their manufactured milk, we must assume that their standards are not necessarily the same as Ohio's. Accordingly, we conclude that the public health interest is served, albeit perhaps tenuously, by the imposition of inspection fees to fund the Ohio inspection program for both in-state and out-of-state product.
 {¶ 17} We now turn to the question of whether the burden created by the fees is clearly excessive to the benefit. The adjudication of constitutional challenges to milk regulations has found its way to our nation's highest court many times. Accordingly, in analyzing Ohio's statute, we are mindful of the extensive body of case law regarding states' milk regulation schemes.
 {¶ 18} Diehl cites West Lynn Creamery, Inc. v. Healy[14] as its primary support for its argument that the fee is unduly burdensome. However, we find West Lynn distinguishable from the instant case. InWest Lynn, Massachusetts imposed a monthly "premium payment" on all dairy "dealers" doing business in the state. The fee was paid into the "Massachusetts Dairy Equalization Fund," and Massachusetts producers received a share of the total fund equal to their contribution to the State's production of raw milk.[15] The United State Supreme Court held that the pricing order amounted to an unconstitutional tariff because "its avowed purpose and its undisputed effect [were] to enable higher cost Massachusetts dairy farmers to compete with lower cost dairy farmers in other states."[16] The Court went on to explain that "[a]lthough the tax also applies to milk produced in Massachusetts, its effect on Massachusetts producers is entirely (indeed more than) offset by the subsidy provided exclusively to Massachusetts dairy farmers."[17]
 {¶ 19} In the instant case, the fee collected for inspection is not returned to Ohio dairy producers in an attempt to subsidize them, rather it is used to fund the inspection process. Moreover, the declared purpose for the Ohio fee is to ensure the quality of manufactured milk products in order to protect the consumer not, as was the case in WestLynn, to bolster the competitiveness of Ohio manufactured milk producers. Thus, we do not find West Lynn dispositive of this case.
 {¶ 20} We conclude that the burden imposed on interstate commerce by the statute is not clearly excessive to the benefit derived from it. In fact, based on the evidence before us, the burden is relatively minor. It does not prevent milk products from moving freely across the Ohio border in a timely fashion.[18] Nor is it clear, as Diehl asserts, that the fee significantly deters Ohio milk processors from purchasing their product from out-of-state producers because processors are required to pay inspection fees on milk purchased in Ohio as well. With regards to Diehl's argument that out-of-state milk is essentially doubly burdened by fees from its own state and then by Ohio fees, there is evidence that at least two of the states in question, Michigan and Indiana, do not require the dairy industry to bear the cost of their inspections.
 {¶ 21} The United States Supreme Court has on at least two occasions suggested that it would endorse a fee system like Ohio's as a less restrictive alternative to unduly burdensome regulatory schemes. InGreat Atlantic and Pacific Tea v. Cottrell,[19] the Court adjudicated the constitutionality of a Mississippi regulation which provided that milk products from another state could only be sold in Mississippi if the other state accepted milk product from Mississippi on a reciprocal basis. In addressing Mississippi's argument that the regulation was necessary to ensure that the reciprocating state's standards were substantially equivalent to its own, the Court opined "[i]n the absence of adequate assurance that the standards of a sister State, either as constituted or as applied, are substantially equivalent to its own, [a state] has the obvious alternative of applying its own standards of inspection to shipments of milk from a reciprocating State."[20]
Furthermore, in Dean Milk Co. v. Madison, the Court endorsed the imposition of fees for such a program, stating "such inspection is readily open to [a state] without hardship for it could charge the actual and reasonable cost of such inspection to the importing producers and processors."[21] Given this approval, and the foregoing analysis, we conclude that the Ohio inspection fee schedule is not an unconstitutional burden on interstate commerce. Accordingly, the appellant's sole assignment of error is sustained.
 {¶ 22} Having found error prejudicial to the appellant herein, in the particulars assigned and argued, we reverse the judgment of the trial court and remand the matter for further proceedings consistent with this opinion.
Judgment reversed.
 SHAW, P.J., and BRYANT, J., concur.
[1] Ohio Historical Soc. v. State Emp. Relations Bd. (1993),66 Ohio St.3d 466, 595-96.
[2] Freeman v. Hewit (1946), 329 U.S. 249, 252, or overruled onother grounds by Complete Auto. Dept. of Revenue v. Association ofWashington Stevedoring Cos. (l978), 435 U.S. 734.
[3] Id.
[4] Id.
[5] Chemerinsky, Constitutional Law: Principals and Policies (1997)306-07, Section 5.3.1.
[6] New Energy Co. of Ind. V. Limbach (1988), 486 U.S. 269,273-74.
[7] H.P. Hood Sons, Inc. v. Du Mond (1949), 336 U.S. 525,531-32.
[8] Id. at 317.
[9] Id. at 319.
[10] C A Carbone, Inc. v. Town of Clarkstown (1994),114 S.Ct. 1677, 1682.
[11] Minnesota v. Clover Leaf Creamery Co. (1981), 449 U.S. 456, 471,quoting Pike v. Bruce Church, Inc. (1970), 397 U.S. 137, 142.
[12] Id.
[13] Aerated Products Co. of Philadelphia v. Department of Health ofthe State of New Jersey (1945), 59 F. Supp. 652, 657, citing People ofthe State of New York ex rel. Lieberman v. Van De Carr (1905),199 U.S. 552.
[14] (1994), 512 U.S. 186.
[15] Id. at 190-91.
[16] Id. at 194.
[17] Id.
[18] Cf. National Farmers Org. Irasburg v. Commissioner ofAgriculture, State of Conn. (1983), 711 F.2d 1156 (holding that all elements of the Connecticut inspection statute, which required duplicative inspections of out-of-state milk, were constitutional, except the portion that caused Vermont farmers a significantly longer delay in initially obtaining a permit than the delay experienced by Connecticut farmers).
[19] 424 U.S. 366.
[20] Id. at 377.
[21] (1951), 340 U.S. 349, 355.