[No. 5863–4–II.   Division Two.   March 2, 1983.]

THE DEPARTMENT OF FISHERIES, *Respondent,* v. DEWATTO FISH COMPANY, ET AL, *Appellants.*

*Bill Tobin,* for appellants.

*Kenneth O. Eikenberry, Attorney General,* and *Dennis D. Reynolds, Assistant,* for respondent.

PETRIE, J.—This appeal by defendant fish processors, grounded upon the commerce clause of the United States Constitution, challenges the constitutionality of a statutory scheme of taxation embodied in former RCW 75.32 as amended in 1978.[1]

The trial court awarded judgment in the amount of $16,219.55 in favor of the Washington State Department of Fisheries and against defendants John Brojac Fish Company, Inc., and its subsidiary DeWatto Fish Company for delinquent taxes due under former RCW 75.32. After appeal to the Supreme Court, the cause was transferred to this court for resolution of the issues. We hold the challenged tax unconstitutional on its face and in its plain effect and, therefore, reverse and remand for reassessment of defendants' tax liability in accordance with the strictures provided by this opinion.

I

NATURE OF THE TAXING SCHEME

Both defendants are Washington corporations engaged in the business of canning or processing fresh fish. They purchase their fish from fishermen both within the state and without the state; defendants also purchase fish caught by Indians in accordance with their treaty rights. Hereinafter, defendants will be referred to in the singular as DeWatto.

The taxing scheme at issue on this appeal subjects defendant to an excise tax levied on the privilege of being an "original receiver," defined as

the person first receiving, handling, dealing in, or dealing with the fresh or frozen food fish or shellfish within the jurisdiction of the state of Washington as a canner, curer, freezer, retail dealer, wholesale dealer, byproducts manufacturer, or branch plant.

Laws of 1977, ch. 327, § 27; former RCW 75.32.080. This privilege fee is imposed on defendant "regardless of where

---

[1]RCW 75.32 was repealed by Laws of 1980, ch. 98 with a savings clause continuing the authority to collect taxes incurred before July 1, 1980. An excise tax on possession of food fish and shellfish is now provided by RCW 82.27.

the fish or shellfish were caught". Former RCW 75.32.065. For example, when fish caught in Alaska are purchased and transported into the state, DeWatto becomes liable for a privilege fee as an "original receiver."

The measure of the tax is a percentage of the market value of the fish purchased. As an original receiver under the statute, DeWatto's privilege fee liability is computed on the primary market value of the fish as follows:

> (1) . . . five percent . . . on . . . chinook, coho, and chum salmon, . . . (2) . . . three percent . . . on . . . pink and sockeye salmon, . . . and (3) . . . two percent . . . on all other . . . fish and shellfish, . . . except oysters, . . .

Former RCW 75.32.030.

Under certain circumstances the statutory scheme allows DeWatto credits against its privilege fee liability.[2] When DeWatto purchases fish out of state which are subject to a tax liability, it is allowed to reduce its privilege fee by the liability incurred to the other state. Former RCW 75.32-.033(2). For example, if DeWatto purchases a chinook salmon caught in Alaska waters for which defendant is subjected to a 4 percent tax imposed by Alaska, DeWatto may reduce its privilege fee liability by that amount, thus remitting 1 percent to this state. Further, the taxation scheme allows DeWatto another method of significantly reducing its privilege fee liability. Former RCW 75.32-.033(1). When DeWatto purchases fish from in–state fishermen who are subjected to a "fish sales tax" imposed by

---

[2]Before its repeal RCW 75.32.033 provided:

"Credits against privilege fees owed under RCW 75.32.030. The following amounts may be credited against the amount of privilege fees owed under RCW 75.32.030 by a canner, curer, dealer, freezer, or manufacturer:

"(1) In respect to each transaction in which the fish sales tax is collected pursuant to RCW 75.32.080, as now or hereafter amended, and a privilege fee is owed, the amount of the sales tax collected shall be credited against such privilege fee.

"(2) Any sales tax, catch tax, landing tax, or other tax or fee on food fish or shellfish, or parts thereof, purchased by an original receiver, as defined in RCW 75.32.080, as now or hereafter amended, in another state and imposed on the receiver by such state shall be credited against the amount of privilege fees owed in respect to such food fish or shellfish, or parts thereof."

former RCW 75.32.055, DeWatto reduces its privilege fee liability by the amount of fish sales tax collected from the fishermen. For example, fishermen who sell fish to DeWatto within the state pay a fish sales tax to the state for the privilege of doing so. The amount of tax borne by the in-state fishermen is computed at a rate which is exactly one-half of DeWatto's privilege fee liability.[3] DeWatto, as the original receiver of this fish, however, is charged with the duty of collecting this fish sales tax from the in-state fishermen and remitting it, together with DeWatto's privilege fee taxes, to the state. Former RCW 75.32.080.

Although treaty Indians selling fish to an original receiver in this state are not expressly exempted from payment of the fish sales tax, the State concedes that treaty Indian fishermen are, in fact and in practice, immune from payment of this tax. *See Sea–Pac Co. v. Department of Fisheries,* 30 Wn. App. 659, 638 P.2d 92 (1981).

Because this entire interrelated scheme of taxation is somewhat confusing, a hypothetical illustration of the effect of the tax impact upon DeWatto may be helpful. Assuming that an original receiver, such as DeWatto, wishes to purchase a chinook salmon with a primary market value of $10, the following tax liabilities will be incurred under each of these several different situations. When DeWatto purchases the salmon in state from a fisherman who is not an Indian,

---

[3]Before its repeal RCW 75.32.055 provided:

"Fish sales tax—Imposed—Rates—Exemptions. (1) Except as provided in subsection (2) of this section, there is hereby imposed a fish sales tax on the privilege of selling food fish or shellfish, or parts thereof, to an original receiver as defined in RCW 75.32.080, as now or hereafter amended. The tax shall be as follows:

"(a) Two and one–half percent of the primary market value on all fresh or frozen chinook, coho, and chum salmon, or parts thereof;

"(b) One and one–half percent of the primary market value on all fresh or frozen pink and sockeye salmon, or parts thereof;

"(c) One percent of the primary market value on all other fresh or frozen food fish and shellfish, or parts thereof.

"(2) The sales tax prescribed in this section shall not apply to sales of shellfish, or parts thereof, taken from a licensed oyster or clam farm or to sales of food fish or shellfish, or parts thereof, taken from a licensed fish farm."

its initial privilege fee liability for this particular transaction is 5 percent, or 50 cents. The in–state fisherman is subject to 2½ percent fish sales tax, or 25 cents, which DeWatto deducts from the purchase price of the fish and also from its tax liability, thus decreasing its privilege fee from 50 cents to 25 cents. DeWatto then owes the State a 25–cent privilege fee (2½ percent) and the in–state fisherman bears the burden of a 25–cent fish sales tax (2½ percent). The clear effect is an equal sharing of the tax burden by each participant in the transaction and ensures a full 5 percent tax remittance by DeWatto to the State on the transaction.

When DeWatto buys the $10 chinook salmon from a treaty Indian fisherman or from an Alaskan fisherman, it incurs a full 5 percent tax burden, or 50 cents, which it shares with no one. The same fish DeWatto purchased in state bearing a 2½ percent tax (or 25–cent privilege fee) doubles DeWatto's tax liability to 5 percent (or 50–cent fee) when purchased under these circumstances. As to fish purchased from treaty Indians, Washington receives the full 5 percent. As to fish purchased in another state, former RCW 75.32.033(2) grants DeWatto a credit. Nevertheless, whether Washington shares this 5 percent tax liability with another state does not alter the overall impact of the total tax burden upon DeWatto: When DeWatto, as an original receiver, purchases fish out of state or from treaty Indian fishermen, it incurs twice the tax burden as when it purchases in state from fishermen who are not Indians. We are required in this opinion to analyze this facial doubling of DeWatto's overall tax burden.

At trial, DeWatto challenged this scheme of taxation on numerous grounds,[4] all of which have been abandoned on

---

[4]The State initiated this action against defendants in June 1979, for unpaid privilege fees. In a motion to dismiss, DeWatto challenged the constitutionality of former RCW 75.32 as violative of the import–export clause, U.S. Const. art. 1, § 10, cl. 2, the supremacy clause, U.S. Const. art. 6, cl. 2 (federal law relating to Indian treaty fishing rights preempts state taxation of a non–Indian trader), and the commerce clause, U.S. Const. art. 1, § 8, cl. 3.

appeal save one—that the privilege taxes imposed by the State discriminates against interstate and Indian commerce by placing this protected commerce *at a competitive disad-* vantage with in–state goods. The trial court disposed of this challenge and held that the privilege fee imposed upon DeWatto occurred in state and was imposed upon a purely local event, the privilege of doing business in this state, thus placing the tax outside the protection of the constitutional guaranty. Furthermore, the court found DeWatto lacked standing to challenge both the constitutionality of the effect of the credit provisions in the statute and the effect of the Indian exemptions. Respectively, the court reasoned that DeWatto suffered no economic injury by having its privilege fee reduced and since it was not a treaty Indian, could not assert the statute's effect upon Indian commerce. We disagree with both contentions.

## II
### Recent Approaches to the Commerce Clause

The United States Supreme Court has adopted an approach to commerce clause actions which emphasizes the realistic effect of a challenged state tax, declining to base an entire analysis on the formal label placed on the tax or upon the express legal incidence as characterized by the enacting state legislature. *See Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 51 L. Ed. 2d 326, 97 S. Ct. 1076 (1977). This has allowed the court to scrutinize a state tax which ostensibly attaches only to a "local" or intrastate activity to determine whether any "indirect" negative effect upon interstate commerce is operating. *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 340, 53 L. Ed. 2d 383, 97 S. Ct. 2434 (1977). We note, incidentally, that this developing approach to commerce clause issues has also enabled the court to reject outright the notion that state taxes imposed directly on interstate commerce are invalid per se. *See Department of Rev. v. Association of Wash. Stevedoring Cos.,* 435 U.S. 734, 55 L. Ed. 2d 682, 98 S. Ct. 1388 (1978). The most recent example of this analyt-

ical approach to this problem is found in *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 69 L. Ed. 2d 884, 101 S. Ct. 2946 (1981). There, although upholding Montana's severance tax on coal mined in the state because it comported with the test set forth in *Complete Auto Transit, Inc.,* the Court finally laid to rest the notion that a state taxing scheme can escape commerce clause scrutiny if the events taxed are "local" activities prior to the entry of goods into the stream of interstate commerce. Language to the contrary found in *Heisler v. Thomas Colliery Co.,* 260 U.S. 245, 67 L. Ed. 237, 43 S. Ct. 83 (1922) was expressly disapproved in *Commonwealth Edison Co. v. Montana,* 453 U.S. at 614.

In applying the foregoing law to the case at bench, Washington's tax on the privilege of handling fresh food fish within its jurisdiction cannot escape commerce clause scrutiny simply because it is imposed on an event which takes place after it has finally left the stream of interstate commerce. DeWatto, as an original receiver, is the buyer and importer of fresh fish caught outside Washington waters. These fish, together with fish caught by local fishermen, are the mainstay of DeWatto's business enterprise as a canner or processor.

### III
### STANDING ISSUE

It is also clear that DeWatto, upon whom the incidence of the privilege fee falls and from whom the State seeks to collect such fee through initiation of this lawsuit, has been injured economically by the effect of the statutory scheme it challenges as unconstitutional.[5] Accordingly,

---

[5]In order to meaningfully and realistically appraise the effect of the privilege fee tax upon the free flow of commerce as well as defendant's standing to challenge the tax, it is necessary to consider the entire scheme contained in former RCW 75.32 as an interrelated whole. *E.g., Maryland v. Louisiana,* 451 U.S. 725, 68 L. Ed. 2d 576, 101 S. Ct. 2114 (1981). *See, e.g., Halliburton Oil Well Cementing Co. v. Reily,* 373 U.S. 64, 10 L. Ed. 2d 202, 83 S. Ct. 1201 (1963). Indeed the Department of Fisheries and the State Attorney General recognized the reciprocal interaction between the privilege fees and the fish sales tax in AGLO 20 (1979)

under the 2–part test of standing enunciated in *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 25 L. Ed. 2d 184, 90 S. Ct. 827 (1970), DeWatto has sufficiently satisfied the first element by alleging that it has suffered an "injury in fact" by being charged with the duty of paying the privilege fees which the department seeks to collect.

The second element of standing to sue, *i.e.,* whether defendant's "injury" arguably falls "within the zone of interests to be protected . . . by the . . . constitutional guarantee in question", *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. at 153, is also satisfied. Defendant is asserting its right to trade in interstate commerce and in Indian commerce, free of discriminatory taxes on its business which, it alleges, operate to infringe on that right by distorting the competitive process, thus making more economically advantageous the purchase of fish from non–Indian fishermen within the state than from out–of–state or treaty Indian fishermen. DeWatto's allegation does not rest upon an assertion of rights of a third party, to wit, treaty Indians and out–of–state sellers (although it is clear that those parties' rights are necessarily implicated in this action). We must be mindful of an inherent and indispensable ingredient of commerce clause issues—which is that commercial intercourse and exchange of trade requires two entities. Simply because DeWatto, as a purchaser, represents only half of this commercial equation, it is not precluded from defending that right. As a buyer of fish out of state and from Indians, DeWatto is as much protected by the constitutional guaranty of trade free from discriminatory laws as is a seller or distributor of goods interstate. *See generally Boston Stock Exch. v. State Tax Comm'n,* 429 U.S. 318, 320 n.3, 50 L. Ed. 2d 514, 97 S. Ct. 599 (1977).

which states in pertinent part:

> Thus, it will readily be seen that the privilege fee and the fish sales tax are to a considerable degree interrelated; this relationship being highlighted by the . . . statutory language permitting a credit for the sales tax collected to be taken against the amount of the privilege fee.

*See, e.g., Commonwealth Edison Co. v. Montana, supra.*

## IV
### FACIAL DISCRIMINATION OF THE SCHEME

Defendant's sole challenge to former RCW 75.32 under the commerce clause focuses on the facial inequality of the taxing scheme and its plain and probable effect. The essence of defendant's argument is that the operation of the privilege fee tax with its credits and exemptions imposes an extra burden upon articles of commerce coming from outside the state and from treaty Indian fishermen which is not borne by intrastate commerce. Defendant alleges that the disparate treatment of in–state and out–of–state purchases creates an undue and unjustifiable burden on protected commerce. Thus, defendant argues, the plain effect of the statute is to inhibit trade across state lines and with treaty Indians because the favorable tax consequences to DeWatto arise only when a purchase is made within the state from a nonexempt entity.

The State counters this argument by focusing on what it perceives to be the facial *equality* of the statute, *i.e.,* 5 percent of the value of any purchase of fish is remitted to the coffers of Washington State (or another state) regardless of whether or how the tax burden is shared by DeWatto with others. The State alleges that if there exists an unequal burden, it arises from defendant's own choice to purchase fish from entities exempt from the fish sales tax. This, the State contends, is a "fortuitous business decision" within defendant's power to control.

The commerce clause of U.S. Const. art. 1, § 8 protects interstate, foreign, and Indian commerce: "The Congress shall have power . . . [t]o regulate commerce with foreign nations, and among the several states, and with the Indian tribes". Commerce clause analysis has long recognized that this power granted to Congress, in the absence of conflicting federal law, will not prevent the states from legislating appropriate local matters even though such protected commerce might be affected. *State v. Chicago, M.,*

*St. P. & Pac. R.R.*, 79 Wn.2d 288, 484 P.2d 1146 (1971). Because defendant does not argue that state taxation on the privilege of handling fresh food fish within Washington is preempted by any federal authority,[6] analysis must begin with the "negative implications" of the commerce clause protections, *i.e.*, that a state tax affecting interstate commerce may not discriminate "against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently." *Philadelphia v. New Jersey*, 437 U.S. 617, 626–27, 57 L. Ed. 2d 475, 98 S. Ct. 2531 (1978).

The United States Supreme Court has expressly developed two analytical approaches to commerce clause cases grounded upon claims of discrimination. Where state legislation does not visit its effect "equally upon both interstate and local business" and is viewed as basic "economic protectionism," a virtual "'*per se* rule of invalidity has been erected.'" *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 36, 64 L. Ed. 2d 702, 100 S. Ct. 2009 (1980) (quoting in part *Philadelphia v. New Jersey*, 437 U.S. at 624). In contrast, where state legislation is effectuated to advance a legitimate and credible local objective "*and there is no patent discrimination against interstate trade,* the Court has adopted a more flexible approach, . . .". (Italics ours.) *Philadelphia v. New Jersey*, 437 U.S. at 624.[7] Although the trend in commerce clause analysis has been to give states wide latitude and to focus upon the practical effect of the

---

[6] On appeal, DeWatto has abandoned the argument that the *supremacy* clause of the United States Constitution preempts the State from taxing a commercial transaction involving fish taken in accordance with Indian treaty rights.

[7] A tax affecting interstate commerce is constitutional if it meets four criteria espoused in *Department of Rev. v. Association of Wash. Stevedoring Cos.*, 435 U.S. 734, 750, 55 L. Ed. 2d 682, 98 S. Ct. 1388 (1978). The tax must: (a) be applied to an activity with a substantial nexus with the state; (b) be fairly apportioned; (c) not discriminate against interstate commerce; and (d) be fairly related to the services provided by the state. The sole constitutional challenge on appeal is aimed at establishing the element of discrimination under (c). DeWatto does not allege that the tax is unfairly apportioned, (b), although there may be grounds for such a challenge.

challenged action (*Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 51 L. Ed. 2d 326, 97 S. Ct. 1076 (1977)), the United States Supreme Court has recently refused to undertake this factual examination and has struck down a challenged statute which it found discriminatory on its face.

In *Boston Stock Exch. v. State Tax Comm'n,* 429 U.S. 318, 50 L. Ed. 2d 514, 97 S. Ct. 599 (1977), the Court invalidated a New York statute which imposed a greater tax burden on in–state securities transfers resulting from out–of–state sales than on those resulting from in–state sales. The express legislative purpose of this provision was to discourage diversion of stock transactions from the New York Exchange and to encourage transactions of securities in New York. The Court held the statute unconstitutional on its face based upon the fundamental principle that no state may "'impose a tax which discriminates against interstate commerce . . . by providing a direct commercial advantage to local business.'" *Boston Stock Exch. v. State Tax Comm'n,* 429 U.S. at 329 (quoting *Northwestern States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 457, 3 L. Ed. 2d 421, 79 S. Ct. 357, 67 A.L.R.2d 1292 (1959)).

More explicitly:

A State may no more use discriminatory taxes to assure that nonresidents direct their commerce to businesses within the State than to assure that residents trade only in intrastate commerce.

*Boston Stock Exch. v. State Tax Comm'n,* 429 U.S. at 334–35.

In *Boston Stock Exch. v. State Tax Comm'n,* the Court rejected the Commission's argument that the tax was merely an equalizing or compensating tax such as that upheld in *Henneford v. Silas Mason Co.,* 300 U.S. 577, 81 L. Ed. 814, 57 S. Ct. 524 (1937),[8] and was enacted to neu-

---

[8]In *Henneford v. Silas Mason Co.,* 300 U.S. 577, 81 L. Ed. 814, 57 S. Ct. 524 (1937), Washington State had assessed a use tax on equipment and material purchased by the taxpayer in other states for use in construction work in Washington. The tax was levied on the "privilege of using within the state any article of tangible personal property," but did not apply to the extent that the property had

tralize the competitive disadvantage suffered by New York because of the lack of any similar tax incident upon the sales of securities in its sister states. The Court was not persuaded since, unlike *Henneford* and other similar use–tax cases, the New York tax did not impose an equal burden upon in–state and out–of–state transactions.

In all the use tax cases, an individual faced with the choice of an in–state or out–of–state purchase could make that choice without regard to the tax consequences. If he purchased in State, he paid a sales tax; if he purchased out of State but carried the article back for use in State, he paid a use tax of the same amount. The taxes treated both transactions in the same manner.

*Boston Stock Exch. v. State Tax Comm'n,* 429 U.S. at 332. *See also Alaska v. Arctic Maid,* 366 U.S. 199, 204, 6 L. Ed. 2d 227, 81 S. Ct. 929 (1961). The Court implied that the

---

already been subjected to any other sales or use tax in the taxing state or elsewhere. Viewed in isolation the use tax effectively applied only to goods purchased out of state because any in–state purchase would already have been subjected to sales tax and thus have been exempted. Before enactment of the tax, retailers within the state, who were required to pay the sales tax, had been at a competitive disadvantage compared to out–of–state sellers who paid no tax at all.

The Court upheld the tax. Viewing the use tax in conjunction with the sales tax, the Court found that the "practical effect" of the overall tax structure imposed a burden on the out–of–state purchase of goods identical to that imposed on an equivalent in–state purchase. The Court's firm conviction that the scheme's design and effect were to produce equality led it to reject objections to the levy under the commerce clause. The Court observed at page 581 that one of the system's "effects must be that retail sellers in Washington will be helped to compete upon terms of equality with retail dealers in other states who are exempt from a sales tax or any corresponding burden." The Court declared at page 583 that "[e]quality is the theme that runs through all the sections of the statute", and it remarked:

> When the account is made up, the stranger from afar is subject to no greater burdens as a consequence of ownership than the dweller within the gates. The one pays upon one activity or incident, and the other upon another, but the sum is the same when the reckoning is closed. Equality exists when the chattel subjected to the use tax is bought in another state and then carried into Washington. It exists when the imported chattel is shipped from the state of origin under an order received directly from the state of destination. In each situation the burden borne by the owner is balanced by an equal burden where the sale is strictly local.

*Henneford v. Silas Mason Co.,* 300 U.S. at 584.

constitutionally acceptable approach to eliminate this competitive edge enjoyed by neighboring states because of New York's tax would simply have been for New York to declare "that sales would not be a taxable event", *i.e.,* to repeal its own in–state tax which had created the disadvantage. *Boston Stock Exch. v. State Tax Comm'n,* 429 U.S. at 330 n.11.

Another recent and relevant commerce clause decision striking down a statutory scheme of taxation as discriminatory on its face is *Maryland v. Louisiana,* 451 U.S. 725, 68 L. Ed. 2d 576, 101 S. Ct. 2114 (1981). Louisiana had enacted a series of provisions for taxes, credits and exemptions collectively known as the first use tax on natural gas. This tax was imposed upon the first use within Louisiana of any natural gas not already subject to a severance tax imposed by Louisiana or by any other state. The express target of this tax was gas extracted on the Outer Continental Shelf (owned by the federal government and untaxed) and brought into Louisiana before shipment to other states. The first use tax levy was 7 cents per thousand cubic feet of gas imported into the state. This rate was precisely equal to Louisiana's severance tax on natural gas within the state. One of the reasons behind the first use tax was to place Louisiana producers who were liable for the severance tax on a competitive parity with offshore producers who remained untaxed. The statute also sought to ensure imposition of the levy's economic burden on the "owners" of natural gas (the pipeline companies) by forbidding them to pass back the use tax to producers and compelling them to absorb the burden themselves or to pass it on to the consumers, 98 percent of whom were out–of–state consumers.

In response to Louisiana's argument that the first use tax was merely a compensatory tax designed to neutralize the competitive disadvantage suffered by in–state producers already subject to a severance tax (citing *Henneford*), the Court held the tax unconstitutional on its face, stating that the "pattern of credits and exemptions . . . violates this principle", *i.e.,* equality of treatment between local and interstate commerce by creating a competitive advantage

which favored local interests.[9] *Maryland v. Louisiana,* 451 U.S. at 759.

Although we recognize that discrimination is an overly simple term for a court's conclusion that the state's Legislature has failed to make the "delicate adjustment" between the national interest in free and open trade and the legitimate interests of the states in exercising their taxing powers, we find that the system of credits and exemptions to the privilege fees imposed upon defendant by former RCW 75.32, thus laying twice the tax burden upon an original receiver when purchases are made in interstate and in Indian commerce than when the same purchase is made within the state of Washington from a fisherman who is not a treaty Indian, is not the evenhanded regulation traditionally upheld under commerce clause scrutiny.[10] *H.P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 553, 93 L. Ed. 865, 69 S. Ct. 657 (1949) (Black, J., dissenting). The clear and probable effect of such a system of taxation is to encourage the economic provincialism which the commerce clause is designed to restrain; any fish processor would

---

[9]The hypothetical economic impact of the competitive advantage enjoyed by Louisiana was illustrated by the Court in footnote 28: "'Owner A has 1000 mcf of OCS gas; owner B has 500 mcf of OCS gas and 500 mcf of gas subject to Louisiana's severance tax. A owes $70 of first use tax; B owes $35 of first use tax and $35 in severance tax. B, however, pays only $35 in first use taxes. He owes no severance tax because he can credit the first use payment against the severance tax liability.' . . .

". . . As a result, First–Use Taxpayers have an incentive to 'undertake mineral extraction activities in Louisiana so as to minimize their effective First Use Tax burden and to compete on equal terms with other First Use Taxpayers whose First Use Tax burden has already been so minimized.'" *Maryland v. Louisiana,* 451 U.S. at 757 n.28.

[10]In *Sea–Pac Co. v. Department of Fisheries,* 30 Wn. App. 659, 638 P.2d 92 (1981), *review denied,* 97 Wn.2d 1010 (1982), Division One of this court upheld the same statutory scheme under an equal protection challenge. Although discrimination of the taxing scheme is the constitutional focal point in *Sea–Pac,* and the case at bench, greater scrutiny is generally afforded to challenges aimed at establishing discrimination under the commerce clause than a constitutional challenge based upon equal protection guaranty and not involving a suspect class or a fundamental right. *See generally* P. Hartman, *Federal Limitations on State and Local Taxation,* ch. 2, 3 (1981).

probably be disinclined to purchase fish outside the state or from treaty Indians because to do so would be to lose the economic advantage of having its tax burden reduced by half. Thus, out–of–state and Indian sellers suffer the competitive disadvantage of the market distortion and in–state purchasers suffer a constricted competitive market. This inhibiting effect upon the free flow of commerce cannot be viewed as merely an incidental burden justified by legitimate local concerns. Although the legislative intent expressed in RCW 75.18.100 is to utilize the privilege fees and fish sales taxes collected on transactions in salmon to provide funds for the state's salmon enhancement program, the Department of Fisheries has not credibly advanced any argument that such disparate tax treatment of in–state and out–of–state or Indian purchases of food fish could be justified by, what at least appears to be, a legitimate local objective.[11]

## V

### CONCLUSION

■ In summary, we find that the privilege fee taxing scheme is facially unconstitutional under the commerce clause of the United States Constitution. Moreover, the provisions contained in former RCW 75.32 are so clearly interrelated that the judicial remedy of severing the superficial offender, the fish sales tax credit (former RCW 75.32-.033(1)), would alter the purpose of the entire statutory scheme—that an equal tax burden totaling 5 percent be shared by those engaged in the commercial fishing industry

---

[11]We are mindful that the nature of the salmon's life cycle and habits makes it likely that salmon caught by Indian fishermen within Washington and even salmon caught in the waters of Alaska could have benefited from Washington's enhancement program. *See* RCW 75.18.005. *See also United States v. Washington,* 384 F. Supp. 312, 386 (W.D. Wash. 1974), *aff'd,* 520 F.2d 676 (9th Cir. 1975), *cert. denied,* 423 U.S. 1086, 47 L. Ed. 2d 97, 96 S. Ct. 877 (1976). However, this fact, plus the parties' recognition that Indian tribes within Washington maintain their own salmon enhancement facilities and that a significant amount of the funding for the state's program is received through federal grants, would not combine to legitimize or outweigh this statutory scheme's disparate treatment and its effect upon protected commerce.

of this state. If the fish sales tax were to be severed, the entire tax remitted to the state on any purchase within its boundaries would increase from 5 percent to 7½ percent, and DeWatto, rather than sharing the burden equally with the in-state fishermen, would assume two-thirds of it, or 5 percent. Therefore, in spite of the existence of a severability clause, we find that "the elimination of the unconstitutional portion so destroys the act as to render it incapable of accomplishing the legislative purposes." *State v. Anderson*, 81 Wn.2d 234, 236, 501 P.2d 184 (1972).

We hold former RCW 75.32 unconstitutional in its entirety and, accordingly, reverse the decision of the trial court and remand for a reassessment of defendant's tax liability.

PETRICH, C.J., and REED, J., concur.

Reconsideration denied April 8, 1983.

Review granted by Supreme Court June 3, 1983.