[No. 49536–0. En Banc. December 8, 1983.]

THE DEPARTMENT OF FISHERIES, *Petitioner,* v.
DEWATTO FISH COMPANY, ET AL,
*Respondents.*

*Kenneth O. Eikenberry, Attorney General,* and *William B. Collins, Dennis D. Reynolds,* and *Timothy R. Malone, Assistants,* for petitioner.

*Cooper, Newton & Tobin* and *Bill Tobin,* for respondents.

*Paul L. Stritmatter, Keith L. Kessler, F. Mark McCauley, Ronald N. Richards,* and *Jane Cantor Shefler,* amici curiae for respondents.

UTTER, J.—This is an action by the Department of Fisheries (the Department) against two related fish companies and their officers and directors (DeWatto) to collect two

types of back taxes imposed by former RCW 75.32.[1] The first tax was a privilege fee ranging from 2 to 5 percent of the market value of the fish, depending on species, imposed on the "original receiver"[2] of such fish. Former RCW 75.32-.030. The second tax was a fish sales tax at one–half the privilege fee rates imposed on the seller of fish to an original receiver. Former RCW 75.32.055.

The sales and privilege taxes were statutorily intertwined. The original receiver was obligated to deduct the sales tax from the amount paid the seller, and to remit the sales tax to the State. Former RCW 75.32.080. The original receiver was allowed a credit against its privilege fees in the amount of any fish sales tax so collected, as well as for any fish taxes paid in another state. Former RCW 75.32.033. Thus, when an original receiver collected the proper sales tax from a fisherman, its privilege fee was reduced by one–half. But when it bought fish from a fisherman from whom it could not collect the sales tax, such as an Oregon, Canadian or treaty Indian fisherman, it would have to pay the full privilege fee.

At trial, DeWatto moved to dismiss the action on the basis that the tax scheme was unconstitutional. The trial court held the privilege fee and fish sales taxes constitutional, but expressed "grave doubts" about the constitutionality of the credit against the privilege fee for the sales tax. However, since DeWatto did not challenge the credit or the benefits it received thereunder, the trial judge declined to rule on its validity. The trial court rendered judgment against DeWatto for $16,219.55.

DeWatto appealed directly to this court, which trans-

---

[1]The tax scheme dealt with in this case was replaced effective July 1, 1980, with the scheme set out in RCW 82.27. The new tax scheme does not affect taxes owed under the old tax structure, however. Furthermore, the tax scheme now in effect has been challenged in part on the theory upheld by the Court of Appeals in this case. Stritmatter v. Department of Fisheries, Thurston County cause 83–2–00508–3 (April 15, 1983).

[2]The original receiver was the processor or dealer who first received the fish within the jurisdiction of this state. Former RCW 75.32.080.

ferred the case to Division Two of the Court of Appeals. The Court of Appeals ruled that the tax scheme discriminated against interstate and Indian commerce in violation of the commerce clause of the United States Constitution because it penalized DeWatto for buying fish from out of state and treaty Indian fishermen. *Department of Fisheries v. DeWatto Fish Co.*, 34 Wn. App. 135, 660 P.2d 298 (1983). The Court of Appeals also held that the various taxes and credits were so closely interrelated that severing only the "superficial offender", the fish sales tax credit, would so destroy the act as to render it incapable of accomplishing the legislative purpose. 34 Wn. App. at 150–51. Thus, the entire tax scheme was struck down.

The Department again appealed to this court to decide whether former RCW 75.32 unconstitutionally discriminated against interstate and Indian commerce. We hold that it did not.[3]

The commerce clause gives Congress the exclusive right and power to "regulate commerce with foreign nations, and among the several states, and with the Indian tribes". U.S. Const. art. 1, § 8, cl. 3. This exclusive grant of congressional power acts to invalidate a state tax affecting interstate commerce unless it meets four criteria, one of which is that the tax may not discriminate against interstate commerce. *Department of Rev. v. Association of Wash. Stevedoring Cos.*, 435 U.S. 734, 750, 55 L. Ed. 2d 682, 98 S. Ct. 1388 (1978); *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 51 L. Ed. 2d 326, 97 S. Ct. 1076 (1977). Although the United States Supreme Court has not yet articulated a clear and concise modern test for the validity of taxes affecting Indian commerce, it is clear that

---

[3]Amici curiae on behalf of High Tide Seafoods, James Shefler, and Ernest Vail filed a brief urging us to strike down the tax scheme on equal protection, First Amendment or Indian treaty grounds, or because it violated the commerce clause for reasons other than discrimination against interstate or Indian commerce. Since these issues were not raised before the trial court or Court of Appeals and have not been argued to this court by any of the parties, we need not consider them here. We also do not reach the issue of severability.

the commerce clause also prohibits state taxes that discriminate against Indian commerce. *See Washington v. Confederated Tribes,* 447 U.S. 134, 157, 65 L. Ed. 2d 10, 100 S. Ct. 2069 (1980); *Blackfeet Tribe v. Montana,* 507 F. Supp. 446, 450 (D. Mont. 1981); *cf. Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434, 444–51, 60 L. Ed. 2d 336, 99 S. Ct. 1813 (1979) (applying the 4–part interstate commerce test, with two additional requirements gleaned from the nature of international law, the exigencies of foreign affairs, and the intent of the framers of the constitution, to taxes affecting foreign commerce).

A state tax "discriminates" against interstate or Indian commerce when it provides a direct commercial advantage to local, non–Indian business. *See, e.g., Maryland v. Louisiana,* 451 U.S. 725, 754, 68 L. Ed. 2d 576, 101 S. Ct. 2114 (1981). Such a tax is invalid per se if it is patently discriminatory on its face, and it is also invalid if it appears to be even handed but discriminates in its practical effect. *See, e.g.,* P. Hartman, *Federal Limitations on State and Local Taxation* § 2:19 (1981); *Department of Fisheries v. DeWatto Fish Co., supra* at 145–46. DeWatto has the burden of proving such discrimination. *See Department of Rev. v. Association of Wash. Stevedoring Cos., supra* at 750–51.

We conclude that the Washington fish tax scheme did not provide a direct commercial advantage to non–Indian Washington fishermen because it placed an equal economic burden on all fish sales, regardless of where or from whom the fish were purchased. That the identity of the party bearing the legal incidence of the tax shifted to reflect the fact that certain parties were not subject to state taxation is of no practical or constitutional significance since the total tax rate remained equal and the parties had the opportunity to allocate the burden among themselves.

To illustrate, assume that a processor buys a Chinook salmon in Washington from a non–Indian fisherman for $10. The processor deducts from the price the fish sales tax of 2.5 percent, or $0.25, and therefore pays the fisherman a

net price of $9.75. It then owes the State a privilege fee of 5 percent, or $0.50. But since the processor receives a credit for the $0.25 fish sales tax collected, its net privilege fee is only $0.25. It must pay the State the net privilege fee plus the sales tax collected from the fisherman, a total net tax of $0.50. The final result is that the processor pays a total of $10.25 for the fish: $9.75 to the fisherman and $0.50 to the State.

Next assume that the processor wishes to buy an identical fish for the same price in Oregon or from a treaty Indian fisherman. Since it cannot collect a fish sales tax, the processor will have to pay the State the full $0.50 privilege fee. The total net tax is $0.50 in both cases, although in the first example the legal incidence is split equally between the fisherman and the processor, while in the second example the processor bears the entire legal incidence of the tax. Figure 1, attached as an appendix to this opinion, graphically illustrates how the tax scheme places an equal total burden on all fish sales.

Moreover, depending on the economic forces operating in the fish market, the processor may pass some or all of the *actual burden* of the fish sales tax along to the nontaxable fisherman. For example, the processor who pays a total of $10.25 for a fish caught by taxable fishermen will ordinarily be willing to buy an Oregon or treaty Indian fish only if the purchase price and privilege fee total no more than $10.25. The processor will therefore lower the price it pays to nontaxable fishermen until the purchase price and privilege fee together total $10.25, the price for fish caught by taxable fishermen. If the market works to shift the actual burden of the tax in this way, fish caught by taxable and nontaxable fishermen will cost the processor (and ultimately the consumer) exactly the same total price, and the fisherman will effectively pay up to half of the total tax regardless of whether he or she is technically subject to the tax.

There is ample support for the commonsense view that merely shifting the legal incidence of a tax from a nontaxable to a taxable party is not discriminatory. In *Southern*

*Pac. Co. v. Gallagher,* 306 U.S. 167, 83 L. Ed. 586, 59 S. Ct. 389 (1939), for instance, California imposed a sales tax on retailers who sold tangible personal property within the state. Since California could not tax out–of–state retailers for the sale of such property to state residents, however, it imposed a use tax at the same rate on *consumers* for the privilege of storing, using or consuming in California property purchased outside the state. Property covered by the sales tax was exempt from the use tax. The Court determined that the use tax did not constitute a direct tax on interstate commerce, and also held that it did not discriminate against such commerce:

> A discrimination against goods of out–of–state origin on the face of the sales and use acts is suggested because the local retailer may absorb the sales tax while the consumer of an imported article must pay the use tax. But this is not a discrimination in the law. California's exaction for the distribution of tangible personal property is the same, whether purchased within or without her borders or whether paid by the retailer or consumer. There is an equal charge against what is used, whatever its source.

(Footnote omitted.) *Southern Pac. Co. v. Gallagher, supra* at 172. Appendix figure 2 illustrates the tax scheme upheld in *Gallagher.* Comparison with figure 1 reveals that the only difference between the California sales and use tax scheme and the Washington fish tax scheme is that the California scheme shifted the *entire* legal incidence of the tax from the nontaxable to the taxable party, while the Washington scheme only shifted half the total burden. If anything, this difference favors the validity of the Washington scheme. Although the test employed to determine violations of the commerce clause is more sophisticated today than when *Gallagher* was decided, that case directly addressed the only prong of the modern test that the parties have asked us to consider—discrimination against interstate or Indian commerce. *See also Henneford v. Silas Mason Co.,* 300 U.S. 577, 81 L. Ed. 814, 57 S. Ct. 524 (1937), where the Supreme Court held that Washington's

sales and use tax scheme did not discriminate against interstate commerce because, as Justice Cardozo wrote for the Court, "[w]hen the account is made up, the stranger from afar is subject to no greater burdens as a consequence of ownership than the dweller within the gates . . . the sum is the same when the reckoning is closed." *Henneford,* at 584.

More recent cases have come to the same conclusion in other contexts. In *Washington v. United States,* ___ U.S. ___, 75 L. Ed. 2d 264, 103 S. Ct. 1344 (1983), for instance, Washington imposed a tax on landowners who purchased construction labor and materials from contractors. When the landowner was the United States, which is exempt from state taxes under the supremacy clause, the legal incidence of the tax was shifted to the contractor. After noting that a tax that is not laid directly on the federal government is valid under the supremacy clause if nondiscriminatory, the Court held that the Washington tax scheme did not discriminate against federal contractors. The Court analyzed the same arguments made by DeWatto in this case as follows:

> The United States argues that it is inappropriate to consider the economic burden on the contractor and the owner together, and that we should focus solely on the tax the contractor is required to pay. When the case is viewed in this light, we are told, it is apparent that federal contractors pay more than other contractors. . . .
>
> This way of looking at the problem is unrealistic. The appropriate question is whether a contractor who is considering working for the Federal Government is faced with a cost he would not have to bear if he were to do the same work for a private party. If he works for the Federal Government, the contractor is required to pay a tax on the materials he buys. The contractor will count the tax among his costs in setting a price for the Government. Depending on his bargaining power, he may pass some or all of the tax on to the Federal Government . . . If the tax is the same, and the parties have the same bargaining power, the amounts the purchasers pay and the amounts the contractors receive will be identical in the two cases.

Thus, it makes no difference to the contractor (or to the purchasers) which of them is required to pay the tax to the State, as long as they have the opportunity to allocate the burden among themselves by adjusting the price. *Washington v. United States,* 103 S. Ct. at 1348 n.4. The Court also explained that it is not necessary that the contractor have sufficient bargaining power to *actually* pass the tax along to the government, since "the *opportunity* for the parties to allocate the economic burden of the tax among themselves was sufficient." 103 S. Ct. at 1349. Since the tax was "imposed at the same rate on every retail transaction in Washington", 103 S. Ct. at 1350, and the parties had the opportunity to allocate the burden among themselves, the Court found that the tax did not discriminate against the United States or federal contractors. Although DeWatto's attack on the fish tax scheme is based on the commerce clause rather than the supremacy clause, we find the Supreme Court's reasoning that shifting the legal incidence of a tax from a nontaxable to a taxable party does not constitute discrimination persuasive in this context as well.[4]

*See also United States v. Detroit,* 355 U.S. 466, 2 L. Ed. 2d 424, 78 S. Ct. 474 (1958) (tax on lessee of federal land held valid even though passed directly on to the United States under the terms of the lease, because it was no greater than the property tax that the owners of taxable property pay or pass along to their lessees); *United States v. Department of Rev.,* 202 F. Supp. 757 (N.D. Ill.), *aff'd per curiam,* 371 U.S. 21, 9 L. Ed. 2d 95, 83 S. Ct. 117 (1962) (upheld tax on seller of goods to United States in same

---

[4]Analogies between cases attacking taxes on commerce clause and other constitutional grounds are not uncommon. *See, e.g., National Bellas Hess, Inc. v. Department of Rev.,* 386 U.S. 753, 756, 18 L. Ed. 2d 505, 87 S. Ct. 1389 (1967); P. Hartman, *Federal Limitations on State and Local Taxation* § 2:3, at 21–22 (1981) (commerce clause and due process); Blumstein, *Some Intersections of the Negative Commerce Clause and the New Federalism: The Case of Discriminatory State Income Tax Treatment of Out–of–State Tax–Exempt Bonds,* 31 Vand. L. Rev. 473, 547–58 (1978) (citing commerce clause, privileges and immunities, due process and equal protection cases).

amount as use tax charged taxable buyers); *Tonasket v. State,* 84 Wn.2d 164, 525 P.2d 744 (1974), *appeal dismissed,* 420 U.S. 915, 43 L. Ed. 2d 387, 95 S. Ct. 1108 (1975) (cigarette stamp tax normally imposed on sellers held validly shifted to buyers of cigarettes from nontaxable Indians).

Finally, Division One of the Court of Appeals employed similar reasoning in an unrelated decision upholding the same fish tax scheme against an equal protection challenge, noting that "[t]he taxing scheme insures that an equal tax be collected for all salmon caught in waters benefiting from the enhancement program. Original receivers who purchase from nontaxpaying treaty Indians are free to negotiate the price, knowing that they must pay a full privilege fee." *Sea–Pac Co. v. Department of Fisheries,* 30 Wn. App. 659, 664, 638 P.2d 92 (1981), *review denied,* 97 Wn.2d 1010 (1982).

DeWatto and the Court of Appeals rely heavily on *Boston Stock Exch. v. State Tax Comm'n,* 429 U.S. 318, 50 L. Ed. 2d 514, 97 S. Ct. 599 (1977) and *Maryland v. Louisiana,* 451 U.S. 725, 68 L. Ed. 2d 576, 101 S. Ct. 2114 (1981) to show that the fish tax scheme is discriminatory on its face. Both cases are inapposite because they involved schemes that imposed higher total taxes on out–of–state goods than on in–state goods and thereby provided a direct commercial advantage to in–state businesses.

In *Boston Stock Exch.,* the New York Legislature reacted to the growth of out–of–state stock exchanges and a threat by the New York Stock Exchange to relocate in another state by amending the state tax on securities transactions. The legislative history showed a clear purpose to reduce out–of–state competition with in–state exchanges by imposing a greater total tax liability on out–of–state securities transfers than on in–state transfers. *Boston Stock Exch.,* at 325–28, 332. That the Legislature succeeded in this intent is graphically illustrated in appendix figure 3. Comparison of column C in figures 1, 2 and 3 clearly shows the distinction between the unconstitutional New York tax

scheme and the constitutional Washington and California tax schemes.

In *Maryland v. Louisiana, supra,* Louisiana enacted a complex series of taxes, credits and exemptions collectively known as the first use tax on natural gas. The tax applied primarily to gas removed from the federally owned Outer Continental Shelf (OCS) and brought ashore in Louisiana before shipment to other states. Although the tax was exactly equal to the severance tax on Louisiana oil, it was designed so that in practical effect most intrastate users of OCS gas were not burdened by the tax, while out–of–state consumers bore the full tax burden. 451 U.S. at 733. Furthermore, the statute expressly prohibited the taxed parties from passing the tax burden along to anyone other than the ultimate consumers, 451 U.S. at 734, approximately 98 percent of whom resided outside Louisiana. 451 U.S. at 729. Finally, the tax scheme operated to encourage OCS producers to invest in Louisiana gas production. 451 U.S. at 757. Appendix figure 4 illustrates the complex effects of the first use tax. Again, column C points up the distinction between the Louisiana tax scheme and the fish tax scheme attacked here. The Supreme Court concluded that the Louisiana tax scheme violated the principle of equal treatment between local and interstate commerce by creating a competitive advantage for local interests. 451 U.S. at 756, 759.

In summary, the Washington fish tax scheme imposes an equal total tax burden on all fish transactions regardless of where or by whom the fish were caught. Shifting the legal incidence of the tax from a nontaxable to a taxable party does not make the tax discriminatory because the total tax burden is the same and the parties have the opportunity to allocate the tax burden among themselves. Furthermore, as a practical matter, the market will eliminate any disincentives that may exist to buying fish from Indian or out–of–state fishermen. The tax scheme therefore provides no direct advantage to non–Indian Washington fishermen, and does not discriminate against interstate or Indian com-

merce. DeWatto has not met its burden of proving the fish tax scheme unconstitutional.

We reverse the Court of Appeals and reinstate the trial court's judgment.

APPENDIX

Figure 1
Former Washington Fish Tax Scheme

| $100 Worth of Fish | Column A Privilege Fee—5% | Column B Fish Sales Tax—2½% | Column C Total |
|---|---|---|---|
| 1. Intrastate/non–Indian | $2.50 (credit) | $2.50 | $5.00 |
| 2. Intrastate/Indian | $5.00 (no credit) | 0 | $5.00 |
| 3. Interstate | $5.00 (no credit) | 0 | $5.00 |
| 4. $50 fish intrastate | $1.25 (credit) | $1.25 | $5.00 |
| $50 fish interstate | $2.50 (no credit) | 0 | |

Figure 2
California Sales and Use Tax Scheme

| $100 Worth of Tangible Personal Property | Column A Tax on Retailer 5% | Column B Tax on Consumer 5% | Column C Total |
|---|---|---|---|
| 1. Retail sale within state | $5.00 | 0 | $5.00 |
| 2. Sale outside state | 0 | $5.00 | $5.00 |
| 3. $50 retail sale within state | $2.50 | | $5.00 |
| $50 sale out of state | | $2.50 | |

Figure 3
New York Securities Transaction Tax Scheme

Hypothetical Basic Tax Rate
$1.00 Per Share

| 1,000 Shares Stock Transferred in New York | Column A Sale in N.Y. Rate per Share | Column B Sale out of N.Y. Per Share | Column C Total |
|---|---|---|---|
| 1. N.Y. Resident | $350.00 (Lid) | | $350.00 |
| 2. N.Y. Resident | | $1,000.00 | $1,000.00 |

| 3. Nonresident | $350.00 (Lid) | | $350.00 |
| 4. Nonresident | | $1,000.00 | $1,000.00 |

100 Shares Stock
Transferred in N.Y.

| 5. N.Y. Resident | $100.00 | | $100.00 |
| 6. N.Y. Resident | | $100.00 | $100.00 |
| 7. Non–N.Y. Resident | $50.00 (50% reduction) | | $50.00 |
| 8. Non–N.Y. Resident | | $100.00 | $100.00 |

Figure 4
Louisiana's First Use Tax Scheme

| 100,000 cu. ft. Gas | Column A<br>First Use Tax<br>($0.07 per cu. ft.) | Column B<br>Severance Tax<br>($0.07 per cu. ft.) | Column C<br>Total |
|---|---|---|---|
| 1. Produced in state | 0 | $7.00 | $7.00 |
| 2. Produced OCS | $7.00 | 0 | $7.00 |
| 3. 50,000 cu. ft. produced in state | 0 | 0 credit | |
| 50,000 cu. ft. produced OCS | $3.50 | 0 | $3.50 |
| 4. Produced in state/ used in state | 0 | $7.00 | $7.00 |
| 5. Produced OCS/ used in state | 0 | 0 | 0 |
| 6. Produced in state/ used out of state | 0 | $7.00 | $7.00 |
| 7. Produced OCS/ used out of state | $7.00 | 0 | $7.00 |

WILLIAMS, C.J., and ROSELLINI, BRACHTENBACH, DOLLIVER, DORE, DIMMICK, and PEARSON, JJ., concur.